## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | |
|---|---|
| **BELCAN, LLC,**<br>**10151 Carver Road**<br>**Cincinnati, OH 45242,**<br><br>**Plaintiff,**<br><br>-v-<br><br>**ADP, INC.,**<br>**Attention: Legal Department**<br>**400 W. Covina Boulevard, MS 208**<br>**San Dimas, CA 91773,**<br><br>***Also Serve Registered Agent:***<br>**The Corporation Trust Company**<br>**Corporation Trust Center**<br>**1209 Orange Street**<br>**Wilmington, DE 19801,**<br><br>**Defendant.** | Case No. _____<br><br>(Judge _____)<br><br><br>**COMPLAINT FOR MONEY**<br>**DAMAGES AND OTHER RELIEF**<br><br>**JURY DEMAND** |

Plaintiff Belcan, LLC ("Belcan"), for its Complaint against Defendant ADP, Inc. ("ADP"),

states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Belcan is a limited liability company organized under Ohio law with its

principal place of business at 10151 Carver Road, Cincinnati, Ohio 45242.

2.      Defendant ADP is a Delaware corporation with its principal place of business at 1

ADP Boulevard, Roseland, New Jersey 07068.

3.      There is not complete diversity of citizenship because both Belcan and ADP are

citizens of Delaware.

4.      The Court has subject matter jurisdiction over this matter.

5.      The Court has personal jurisdiction over ADP because ADP purposely availed itself

1

of the privilege of doing business in Ohio and contracted to supply services to Belcan in Ohio.

6.      Venue is proper in this Court because the action arose out of business conducted in Hamilton County, Ohio.  Additionally, Belcan's claim for relief arose in this county because Belcan resides in Hamilton County and suffered its damages in this county.

## STATEMENT OF FACTS

7.      Belcan is a global supplier of engineering, manufacturing & supply chain, workforce, and government IT solutions to customers in the aerospace, defense, commercial vehicles & automotive, industrial, and private sectors.

8.      ADP is a global provider of payroll processing services.

9.      On December 31, 2013, Belcan and ADP entered into a Master Services Agreement (the "MSA"), whereby ADP agreed to provide certain payroll services to Belcan.  (A true and accurate copy of the MSA is attached as **Exhibit A.**)

10.     The MSA is to be "governed by and construed in accordance with the internal laws of the State of New York." (Ex. A. at Annex A, § 9.7.)  The MSA does not have a venue provision.

11.     The payroll services that ADP provides Belcan under the MSA include wage garnishment payment processing.  Belcan sends ADP certain payroll disbursement files, which include payroll data and, to the extent applicable, garnishment orders (e.g., child support) for its employees.  ADP is then responsible for processing the garnishment orders and disbursing payments to the appropriate payees.

12.      Belcan transmits these payroll disbursement files electronically by sFTP to ADP's server.  The files are created upon completion of Belcan's payroll and transmitted using GoAnywhere MFT software.  Belcan transmits multiple file types to ADP for processing, including .pqq files and .grn files.  Belcan has sent this information in the same format and in the

same manner throughout the entire time period that the MSA has been in effect.

13.     On January 16, 2023, ADP informed Belcan that it had discovered that the payroll disbursement files Belcan had sent for certain employees had been sent multiple times. In other words, Belcan had transmitted more than one copy of the same payroll disbursement file for a given employee. Should ADP process the duplicate disbursement files, it would result in an overpayment due to sending out several times what should have been a single payment.

14.     This was the first time Belcan had been made aware that duplicate disbursement files had ever been sent to ADP.

15.     In alerting Belcan to the issue, ADP indicated that it had not processed the duplicate files because its system flagged the duplicates as "errors." In fact, ADP stated that "if the same disbursement file is resent, it errors out as a duplicate in our system."

16.     Belcan responded that it believed it had resolved the issue of multiple disbursement files being transmitted, and that ADP should not receive multiple files going forward.

17.     Belcan was unaware that any additional duplicate disbursement files had been transmitted until April 6, 2023, when ADP asked to schedule a meeting on April 11 "to go over duplicate files received and credits issued in error."

18.     At 4:31 PM that same afternoon, Nicole Diaz, a Client Services Team Lead at ADP, sent the following email to Belcan:

**From:** Diaz, Nicole (ES)
**Sent:** Thursday, April 6, 2023 4:31 PM
**To:** scecardo@belcan.com; jwtaylor@belcan.com
**Cc:** Scallion, Lorena (ES) <Lorena.Scallion@ADP.com>; Carzoli, Liliana (ES) <Liliana.Carzoli@adp.com>
**Subject:** BCN1*Urgent* Please review- Disbursement files with prior check dates being submitted to ADP daily
**Importance:** High

Hello Belcan Corp Team,

Good Afternoon. I hope all is well.
I just called Sophie a moment ago and left a voicemail.

As you all know an invite was sent to have a meeting Wednesday next week.

However, upon further research, we wanted to reach out to you urgently to advise you that ADP has been receiving disbursement files with past check dates daily since 12/14/2022.
Since this has been occurring daily as of that date, we felt it was important to inform you so that you can engage your IT contact(s) to evaluate this on priority and ensure this issue is addressed right away.

Please let us know if you have any questions.

Sincerely,

Nicole

19.     Contrary to Belcan's understanding that duplicate disbursement files had not been sent since January 2023, ADP stated that duplicate disbursement files had been sent "daily since 12/14/2022."

20.     Prior to April 6, 2023, ADP had never processed a duplicate disbursement file. In other words, no third-party payee had ever received an overpayment due to multiple payments, despite ADP's representation that Belcan had been sending duplicate copies of certain disbursement files for nearly four months.

21.     On information and belief, it was Belcan's understanding that the duplicate disbursement files had not been processed because ADP flagged any duplicates as "errors," as ADP had told Belcan its system does in its January 2023 e-mail communications.

22.     In her April 6, 2023 e-mail stating that ADP had received duplicate disbursement

4

files since December 14, 2022, Ms. Diaz did not state, or in any way indicate, that any duplicate payments had been made or would be made going forward.

23.     It was Belcan's understanding that, to the extent the same disbursement file for a particular employee might be transmitted more than once, ADP would continue to flag any duplicates as errors and not process them, precisely as it had been doing since December 2022.

24.     This was especially true given that Belcan has not changed the format of the files or the manner in which it was transmitting the files to ADP throughout the entire time period that the MSA has been in effect.

25.     On April 12, 2023, Belcan and ADP had a meeting to discuss the duplicate disbursement file issue.

26.     It was not until April 13, 2023 that ADP told Belcan for the first time that copies of certain disbursement files were "not failing as duplicates in when they've come across to ADP."

27.     The next day, ADP stated that it had processed multiple duplicate payments from the time frame of April 6 to April 12. In other words, ADP had sent the same payment out multiple times, resulting in overpayments for certain employees' garnishment orders.

28.     The overpayments related to 221 employees.

29.     On April 18, 2023, ADP sent an e-mail to Belcan stating that the overpayments resulting from ADP's processing the duplicate disbursement files amounted to $1,075,423.30 in excess payments.

30.     Because most of the duplicate payments were for child support and have already been disbursed, Belcan has been unable to directly recoup the full extent of the overpaid amounts despite its reasonable efforts.

## COUNT ONE
### (Breach of the Master Services Agreement)

31.     Belcan incorporates by reference the foregoing paragraphs of this Complaint, as if fully rewritten herein.

32.     There exists a valid and enforceable contract between Belcan and ADP—the MSA that the parties entered on December 31, 2013. (*See* Ex. A.)

33.     Belcan has performed its duties and obligations pursuant to the MSA.

34.     Belcan has paid ADP on time and in full for all of ADP's services provided to Belcan under the MSA.

35.     ADP has breached its contractual obligations to Belcan under the MSA.

36.     Specifically, the MSA provides: "If the negligent acts or omissions of ADP's officers, employees or agents result in a loss or misdirection of [Belcan] funds in the possession or control of ADP under the terms of this Agreement, ADP will restore the funds to the Client." (Ex. A at Annex A, § 7.1.)

37.     ADP negligently misdirected Belcan funds by processing the duplicate disbursement files from the time frame of April 6, 2023 through April 12, 2023.

38.     ADP's processing of these duplicate files was negligent because ADP had previously told Belcan in January 2023 that "if the same disbursement file is resent, it errors out as a duplicate in our system."

39.     ADP's processing of these duplicate files was negligent because ADP advised Belcan on April 6 that it had been receiving the duplicate files daily since 12/14/2022, but then ADP proceeded to process the duplicate files for the time frame of April 6, 2023 through April 12, 2023.

40.     ADP's processing of these duplicate files was negligent because ADP has not

6

offered any reasonable explanation as to why it filtered out the duplicate files it received from December 14, 2022 through April 5, 2022, but then proceeded to process the duplicate files for the time frame of April 6, 2023 through April 12, 2023.

41.     ADP's processing of these duplicate files was negligent because ADP did not give Belcan any notice that it would start processing any duplicate files, contrary to how it had operated at all times prior to April 6, 2023.

42.     ADP's processing of these duplicate files was negligent because ADP has not offered any reasonable explanation as to why it processed only some of the duplicate files for the time frame of April 6, 2023 through April 12, 2023, but not all of them.

43.     Belcan transmitted the files to ADP in the same way throughout the entire time period that the MSA has been in effect.

44.     ADP's negligence resulted in the misdirection of $1,075,423.30 in Belcan funds.

45.     Despite written notice and demand, ADP has not restored these funds to Belcan.

46.     As such, ADP remains in breach of Section 7.1 of the MSA, causing significant damage to Belcan.

47.     Despite reasonable efforts to mitigate its damages caused by ADP's breach of the MSA, Belcan's damages remain significant.

48.     As a result of ADP's breach of the MSA, Belcan has incurred damages in excess of twenty-five thousand dollars.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Belcan, LLC respectfully requests that this Court enter judgment in its favor and award the following relief:

(a)     Under Count One, award Belcan actual and compensatory damages in an amount to be proven at trial incurred as a

7

result of ADP's breach of the Master Services Agreement, plus pre-judgment and post-judgment interest;

(b) Award Belcan its costs and reasonable attorneys' fees in pursuing this action; and

(c) Award Belcan any and all other relief that this Court deems just and proper.

Respectfully submitted,

*/s/* Bryce J. Yoder
Bryce J. Yoder (0089816)
John E. Dahm (0100364)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
byoder@kmklaw.com
jdahm@kmklaw.com

*Attorneys for Plaintiff, Belcan, LLC*

## JURY DEMAND

Plaintiff demands a trial by jury.

*/s/* Bryce J. Yoder
Bryce J. Yoder (0089816)

## INSTRUCTIONS TO THE CLERK

Please serve the Summons and Complaint upon Defendant at the addresses listed in the caption of the Complaint via certified mail, return receipt requested, returnable according to law.

13024770.3

8

# Exhibit A



# ADP, INC.
## MASTER SERVICES AGREEMENT
### (cover page)

12/31/13
(Effective Date)

**ADP, INC.:**  400 W. Covina Blvd., MS 208
San Dimas, CA 91773

(referred to herein as "ADP")

**CLIENT:**  Belcan Services Group II
7820 Red Sky Drive
Cincinnati, OH, 45242

(referred to herein as "Client")

Attention:  Richard Schneider
FEIN:

Client desires ADP to provide to Client the services set forth in this Agreement and ADP desires to provide such services to Client, all as provided in this Agreement.

Therefore, upon the terms and subject to the conditions set forth in this Agreement and intending to be legally bound, the parties hereto agree as follows:

ADP will provide to Client and Client will receive from ADP, all upon the terms and conditions set forth in this Agreement, the Services (as such term is defined in Annex A) specified in this Agreement. This Agreement includes the Annexes marked with an "X" below and each Amendment (as such term is defined in Annex A) attached hereto. Each Annex marked with an "X" below and each Amendment attached hereto is incorporated into this Agreement by this reference as if set forth in this Agreement in full.

| | | | | | |
|---|---|---|---|---|---|
| X | Annex A: | General Terms and Conditions | X | Annex W: | ADP Wage Garnishments |
| | Annex B: | Payroll Services | | Annex X: | Labor Billing Policy |
| | Annex C | Tax Filing Services | | Annex Y: | Travel and Expense Policy |
| | Annex D: | ADP Workforce Now Services | | Annex AA: | HR/Benefits |
| X | Annex E: | ADP Employment Tax | | Annex BB: | ADP Wage Payments: ALINE Card |
| | Annex F: | ADP Enterprise Services | | Annex CC: | ADP Disbursement |
| X | Annex G: | ADP Print: W2 Management, Check, and IPay | | Annex DD: | I-9 Compliance Services |
| | Annex H: | ADP Unemployment Claims | | Annex EE: | Expense Management Services |
| | Annex I: | ADP Enterprise Implementation Services | | Annex GG: | ADP Employment Verification |
| | Annex J: | Master Tax Services | | Annex HH: | HR Anytime℠ Services |
| | Annex K: | Benefits Administration Services | | Annex II: | ADP Vantage HCM Services |
| | Annex O: | Time and Labor Management Services | | Annex JJ: | ADP Hosted Software Services |
| | Annex P: | ADP Procure to Pay Solutions & Services | | Annex LL: | ADP Talent Management Services |
| | Annex Q: | COBRA Services | | Annex MM: | ADP Workscape CPM Services |
| | Annex R: | Screening Services | | Annex NN: | ADP Recruitment Process Outsourcing Services |
| | Annex S: | PayForce Services | | Annex OO: | ADP Wage Payments: ALINE Pay Electronic |
| | Annex T: | ADP Wage Payments: ALINE Pay Traditional | | Annex PP: | CAP (Compliance Assurance Package) |
| | Annex U: | Tax Credits | X | Pricing Appendix: | Service and Fee Schedule |
| | Annex V: | VirtualEdge Services | | | |

**IN WITNESS WHEREOF**, ADP and Client have executed this Agreement to be effective as of the Effective Date set forth above.

| ADP, INC. | BELCAN SERVICES GROUP II |
|---|---|
| *(signature)* | *(signature)* |
| (Signature of Authorized Representative) | (Signature of Authorized Representative) |
| YERVANT MANAVIAN | Richard N Schneider |
| (Name - Please Print) | (Name - Please Print) |
| VICE PRESIDENT    12-18-13 | Chief Financial Officer    12/5/13 |
| (Title)        (Date) | (Title)        (Date) |

[***COVER1624095-001 *14 *67629135102514743815631951356866237878177087270 7*1*1***]



**ANNEX A**
**General Terms and Conditions**
Client: Belcan Services Group II

## SECTION 1    DEFINITIONS.

Capitalized words in this Agreement that are not otherwise defined have the meanings shown below, for both singular and plural forms. Unless otherwise specified, any reference in this Annex to a section or other subdivision is a reference to a section or subdivision of this Annex.

**1.1 "ADP Products"** means the Application Programs, tutorials and related documentation delivered to Client by ADP.

**1.2 "Amendment"** means a written supplement to this Agreement, signed by Client and ADP, describing additional Services to be provided by ADP to Client.

**1.3 "Agreement"** means this Master Services Agreement, each Annex marked on the cover page and each Amendment that supplements this Master Services Agreement, as amended from time to time.

**1.4 "Application Programs"** means the computer software programs and modules delivered to Client by ADP as part of the Services but excludes pre-packaged third party software and custom programs developed by ADP for Client.

**1.5 "Business Day"** means any day except a Saturday, a Sunday, or a Federal holiday.

**1.6 "Client Group"** means Client, Client's majority owned subsidiaries, and affiliates of Client. Affiliates are listed in Section 1 of the Pricing Appendix.

**1.7 "Client Infringement Exclusion"** means (i) any change, or enhancement in the ADP Products made by Client or any third party for the Client other than at the direction of ADP, (ii) Client's use of the ADP Products except as permitted under this Agreement or in combination with any hardware, software or other materials not expressly authorized by ADP where absent such combination the ADP Products would be non-infringing, (iii) Client's use of other than the most current release of the ADP Products that results in a claim or action for infringement that could have been avoided by use of the current release, provided that ADP has supplied Client with the most current release at no additional fee, or (iv) the provision by Client to ADP of materials, designs, know-how, software or other intellectual property with instructions to ADP to use the same in connection with the Services.

**1.8 "Confidential Information"** means all information that is confidential or proprietary provided by the disclosing party to the receiving party for use in connection with the Services or in connection with any additional services proposed to be provided by ADP, but does not include (i) information the receiving party already knows (ii) information that becomes generally available to the public except as a result of disclosure by the receiving party in violation of this Agreement, and (iii) information that becomes known to the receiving party from a source other than the disclosing party on a non-confidential basis. Confidential Information also includes the terms of this Agreement, non-public personal or financial information relating to a party's employees, customers or clients, all trade secrets, processes, proprietary data, information or documentation or any pricing or product information the disclosing party provides to the receiving party.

**1.9 "Effective Date"** means the date written in the space marked "Effective Date" on the cover page of this Agreement.

**1.10 "Services"** means the services described in each Annex, the services in each Amendment, and any other services that ADP provides to Client at Client's request.

**1.11 "Termination Event"** means with respect to any party, (i) that party becomes the subject of a proceeding under the Bankruptcy Code, (a) seeking the appointment of a trustee, receiver or custodian or (b) seeking the liquidation, winding-up, dissolution, reorganization or the like of such party, and the proceeding is not dismissed within 30 days of its commencement, or (ii) that party's Dun & Bradstreet Financial Stress Score is 4 or 5. If part (i) of this Section occurs with respect to Client, Client agrees to promptly use commercially reasonable efforts to seek court authorization to pay all post-petition fees as an administrative expense.

## SECTION 2    THE SERVICES.

**2.1 Use of Services.** Client agrees to use the Services only for the internal business purposes of the Client and the Client Group and that it will be responsible for ensuring that each of the entities included in the Client Group comply with each of the provisions contained in this Agreement applicable to the Client. If interfaces to software being used by Client are to be delivered or maintained by ADP as part of the Services, then Client agrees to obtain and maintain appropriate licenses to such software and other works.

**2.2 Accuracy of Client Information, Review of Output.** Client is responsible for the accuracy and timely input of all information provided to ADP by Client or on Client's behalf. Client will promptly review documents and reports provided by ADP and notify ADP of any error or omission discovered by Client or any discrepancy between the information provided by ADP and Client's records, and ADP will correct such error, omission or discrepancy.

**2.3 Compliance with Laws.** ADP shall design the Services to assist Client in complying with federal and state legal and regulatory requirements applicable to the Services, and ADP will be solely responsible for any failure of such design. Client will be solely responsible (i) for compliance by Client with all laws and governmental regulations affecting Client's business and (ii) for using the Services in a manner to assist it in complying with same. The Services are not a substitute for the advice of an attorney and do not include any legal, regulatory, accounting or tax advice and each Client Group member will rely solely upon its own advisors with respect to any such advice. Client agrees and acknowledges that ADP is not a law firm, does not provide legal advice or representation, and that no attorney-client relationship exists or will be formed between ADP and Client.

**2.4 Data Security.** ADP will take commercially reasonable precautions to prevent the loss of or alteration to Client's data files in ADP's possession. In addition, ADP will establish and follow security measures designed to prevent unauthorized access to Client's data files. ADP maintains appropriate security measures to protect Client's personal information consistent with applicable federal and state laws.

**2.5 Disaster Recovery.** ADP maintains a commercially reasonable disaster recovery plan ("DR Plan"), a



[***ANNEXA1624094-001 *17 *043942507998566088558354877809268074867203104854*1*5***]



**ANNEX A**
**General Terms and Conditions**
Client: Belcan Services Group II

copy of the summary of which is available to the Client upon request. ADP agrees to follow its DR Plan. ADP may amend its DR Plan at any time, provided that ADP shall not reduce its disaster recovery ability to less than the disaster recovery ability in effect pursuant to the DR Plan in existence on the Effective Date of this Agreement.

**2.6 Source Documents.** Except as otherwise set forth in this Agreement, Client will, to the extent it deems necessary, keep copies of all source documents of the information delivered to ADP or inputted by Client or on behalf of Client into the ADP system.

**2.7 Client Instructions.** Client will be responsible for the consequences of any instructions Client may give to ADP, provided that ADP has followed such instructions.

**2.8 Additional Services.** If Client requests additional services offered by ADP on a commercial basis not included in this Agreement, (i) those services will be included in an Amendment, (ii) any Services provided to Client but not included in an Amendment will be provided subject to the terms of this Agreement at ADP's then prevailing fees.

**2.9 Errors and Omissions.** Upon the request of Client, ADP will correct any error or omission made by ADP in connection with the Services at no additional charge to Client.

**SECTION 3     FEES, TAXES AND PAYMENT TERMS.**

**3.1 Fees for Services.** Client agrees to pay ADP for the Services provided to any member of the Client Group at the fees shown in the Pricing Appendix.

**3.2 Changes in Scope.** The fees in the Pricing Appendix may be revised by mutual agreement (not to be unreasonably withheld) if Client's actual requirements, specifications, volumes or quantities vary materially from those communicated to ADP as of the Effective Date of this Agreement (e.g., a material change in the number of pays or the pay frequency).

**3.3 Payment Terms.** Client will pay all invoices in full within 45 days of invoice date via electronic debit of funds. All amounts not paid when due are subject to a late payment charge of 1% per month (not to exceed the maximum allowed by law) of the past due amount from the due date until the date paid. All fees are shown in U.S. Dollars and all payments will be made in U.S. Dollars.  In the event that Client's Dun & Bradstreet Financial Stress Score is 4 or 5, then upon ADP's request Client will pay all invoices via direct debit of funds ("DDF").  Client will reimburse ADP for all expenses ADP may incur in collecting any amounts past due under this Agreement.

**SECTION 4     WARRANTIES; DISCLAIMER.**

ADP warrants (i) that it will perform the Services in a good, diligent and professional manner, utilizing personnel with a level of skill commensurate with the Services to be performed; and  (ii) that it will comply with all applicable laws and regulations affecting the operation of ADP's business, including any applicable export restrictions and data protection laws.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ADP EXPRESSLY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, NON-INTERRUPTION OF USE, AND FREEDOM FROM PROGRAM ERRORS WITH RESPECT TO THE SERVICES, THE ADP PRODUCTS, CUSTOM PROGRAMS OR ANY THIRD-PARTY SOFTWARE DELIVERED BY ADP.

**SECTION 5     INTELLECTUAL PROPERTY.**

**5.1 Ownership of Proprietary Rights.**  Client owns and shall own all rights to Client's data provided to or accessed by ADP, including such Client data as processed or manipulated by ADP in connection with the Services. The ADP Products will at all times remain the exclusive, sole and absolute property of ADP or the third parties from whom ADP has obtained the right to use the ADP Products.  Except for the license granted to Client in this Agreement, Client will have no interest in the ADP Products. All rights, title and interest in or to any copyright, trademark, service mark, trade secret, and other proprietary right relating to the ADP Products and the related logos, product names, etc. are reserved and all rights not expressly granted are reserved by ADP and such third parties.  Client may not obscure, alter or remove any copyright, trademark, service mark or proprietary rights notices on any ADP Products, and Client will not, and will require that its vendors and subcontractors will not, copy, recompile, disassemble, reverse engineer, or make or distribute any other form of or any derivative work from, the ADP Products.

**5.2 ADP Infringement Indemnity.** Subject to Section 5.4, ADP will defend Client in any suit or cause of action, and indemnify and hold Client harmless against, and pay on behalf of Client, any damages awarded to third parties in any such suit or cause of action (including reasonable attorneys' fees awarded to such third parties and settlement amounts) alleging that the ADP Products as provided by ADP and used in accordance with the terms of this Agreement infringe upon any United States patent, copyright, trade secret, or other proprietary right of a third party, *provided that*, the foregoing infringement indemnity will not apply and ADP will not be liable for any damages assessed in any suit or cause of action to the extent resulting from a Client Infringement Exclusion. If any ADP Product is held or believed to infringe on any third party's intellectual property rights, ADP may, in its sole discretion, (a) modify the ADP Product to be non-infringing, (b) obtain for Client a license to continue using such ADP Product, or (c) if neither (a) nor (b) are practical, terminate this Agreement as to the infringing ADP Product and return to Client any unearned fees paid by Client to ADP in advance.  This Section 5.2 states ADP's entire liability and Client's exclusive remedies for infringement of intellectual property rights of any kind.

**5.3 Client Infringement Indemnity.** Subject to Section 5.4, Client will defend ADP in any suit or cause of action, and indemnify and hold ADP harmless against, and pay on behalf of ADP, any damages awarded to third parties in any such suit or cause of action (including reasonable attorneys' fees awarded to such third parties and settlement amounts) alleging infringement upon any United States patent, copyright, trade secret, or other proprietary right of a third party, to the extent that any such suit or cause of action results from an allegation of a Client Infringement Exclusion.   This Section 5.3 states Client's entire liability and ADP's exclusive remedies for infringement arising from a Client Infringement Exclusion.

**5.4 Indemnity Conditions.** The indemnities set forth in this Agreement are conditioned upon the following:    (i) the indemnitee ("the Indemnitee") promptly notifies the indemnitor ("the

[***ANNEXA1624094-001 *17 *043942507998566088583548778092680748672031048542*5***]



Indemnitor") in writing of such suit or cause of action, (II) the Indemnitor controls any negotiations or defense and the Indemnitee assists the Indemnitor as reasonably required by the Indemnitor, and (III) the Indemnitee takes all reasonable steps to mitigate any potential damages that may result.

**SECTION 6     GENERAL PROVISIONS.**

**6.1  Service Organization Control I Reports.** At Client's request, ADP will at no charge provide Client with copies of any routine Service Organization Control ("**SOC**") I reports ("**SOC I Reports**") which are both directly related to those Services provided hereunder for Client and already released to ADP by the public accounting firm performing the Statement on Standards for Attestation Engagements #16 review.

**6.2  Employee and Plan Participant Access.** ADP may suspend or discontinue access to the Services by any of Client's employees or plan participants ("Users") if ADP reasonably believes that such User is using the Services in an inappropriate or illegal manner and will promptly advise Client of same. Client shall take all commercially reasonable actions necessary to maintain the privacy of User names and passwords for the Services.

**6.3  Nondisclosure.** All Confidential Information disclosed under this Agreement will remain the exclusive and confidential property of the disclosing party. The receiving party will not disclose the Confidential Information of the disclosing party and will use at least the same degree of care, discretion and diligence in protecting the Confidential Information of the disclosing party as it uses with respect to its own confidential information. The receiving party will limit access to Confidential Information to its employees with a need to know the Confidential Information and will instruct those employees to keep the information confidential. It is understood, however, that ADP may disclose the Client's Confidential Information on a need to know basis to its subcontractors who are performing Services, provided those subcontractors have executed confidentiality agreements and further provided that ADP shall remain liable for any unauthorized disclosure of the Client's Confidential Information by those subcontractors. Notwithstanding Section 5.1 of Annex A, ADP may use the Client's and its employees' and participants' information for purposes other than the performance of the Services but only in an aggregated, anonymized form, such that neither Client nor its employees or participants may be identified, and Client will have no ownership interest in such aggregated, anonymized data. Notwithstanding the foregoing, the receiving party may disclose Confidential Information (I) to the extent necessary to comply with any law, rule, regulation or ruling applicable to it, (II) as appropriate to respond to any summons or subpoena or in connection with any litigation and (III) to the extent necessary to enforce its rights under this Agreement. Upon the request of the disclosing party, the receiving party will return or destroy all Confidential Information of the disclosing party that is in its possession, provided that ADP may maintain archival copies subject to the terms of this Section 6.3.

**6.4  No Solicitation of Employees.** Neither party will recruit or solicit (other than as part of a general solicitation in newspapers, websites or similar media) the other's personnel or employees that have become known to a party as a result of the Services performed until the earlier of one year after (I) the termination of this Agreement or (II) that person is no longer employed by the other party. The provisions of this Section 6.4 will survive the termination of this Agreement.

**6.5  U.S. Government Restricted Rights.** ADP asserts that the Services, the ADP Products and the related materials are provided with RESTRICTED RIGHTS. Use, duplication or disclosure by the Government is subject to restrictions in FAR §52.227-14, FAR §52.227-19, or DFARS §252.227-7013(c)(1)(ii), as applicable. Contractor is ADP, Inc., 5800 Windward Parkway, Alpharetta, GA 30005.

**6.6  Independent Contractors.** The performance by ADP of its duties and obligations under this Agreement will be that of an independent contractor and nothing contained in this Agreement will create or imply an agency, joint venture or partnership between ADP and Client. Neither the employees of ADP nor ADP's subcontractors will be considered employees or agents of Client. Unless expressly stated in this Agreement, none of ADP, its employees or its subcontractors may enter into contracts on behalf of, bind, or otherwise obligate Client in any manner whatsoever.

**6.7  Services and the Internet.** Data transmitted by ADP in connection with the Services through the Internet is encrypted for Client's protection. However, the security of transmissions over the Internet can never be guaranteed. ADP is not responsible for Client's access to the Internet, for any interception or interruption of any communications through the Internet, or for changes to or losses of data through the Internet. ADP may suspend Client's use of the Services via the Internet immediately, without notice, pending an investigation, if any breach of security is suspected. If Client elects ADP's "Federated Single Sign-On" service, additional mutually agreed upon terms and conditions will apply.

**6.8  Use Outside the U.S.** Client will use the Services and the ADP Products only in the U.S. For any agreed upon use of the Services or the ADP Products outside the U.S., Client agrees to comply with any applicable export restrictions, laws and regulations imposed from time to time by the governments of the U.S. or the other country, if any, in which the ADP Products will be used by Client.

**6.9  Client Vendors.** Client will at its own cost make all necessary arrangements with its third party vendors to cause such vendors to send data to and receive data from ADP as required for ADP to provide the Services. Client shall reimburse ADP for any costs ADP is required to bear in connection with or arising out of any such transmissions of data from and/or to such third party vendors.

**SECTION 7      LIMITATION OF LIABILITY.**

**7.1  Restoration of Funds.** If the negligent acts or omissions of ADP's officers, employees or agents result in a loss or misdirection of Client funds in the possession or control of ADP under the terms of this Agreement, ADP will restore the funds to the Client.

**7.2  Mitigation of Damages.** ADP and Client will each use reasonable efforts to mitigate any potential damages or other adverse consequences arising from or related to the Services.

**7.3  Limit on Monetary Damages.** Notwithstanding anything to the contrary contained in this Agreement, ADP's aggregate liability hereunder in any calendar year will not exceed: (I) for damages other than as a result of ADP's breach of Section





6.3 (Nondisclosure). an amount equal to twelve (12) times the average monthly fee for ongoing Services paid by Client to ADP for the affected Service during such calendar year (the "**Ordinary Limit**") and (ii) for damages arising from ADP's breach of Section 6.3 (Non-Disclosure), a separate amount equal to twenty-four (24) times the average monthly fee for ongoing Services paid by Client to ADP for the affected Service during such calendar year (the "**Confidentiality Breach Limit**"). For the avoidance of doubt, the foregoing creates two separate and distinct sums describing ADP's aggregate liability, the Ordinary Limit and the Confidentiality Breach Limit. The aggregate limit set forth herein shall not apply to Sections 5.2 or 7.1 of Annex A, and (if applicable) Section 4 of Annex C, Section 3 of Annex E, Section 5.10 of Annex II, or to ADP'sGross Negligence or Willful Misconduct. As used herein, "Gross Negligence" means (1) willful, wanton, careless or reckless conduct, misconduct, failures, omissions or disregard of the duty of care toward others of a risk known or so obvious that the actor must be taken to have been aware of it, and with an intent to injure or so great as to make it highly probably that harm would follow and/or (2) failure to use even the slightest amount of care, or conduct so reckless, as to demonstrate a substantial lack of concern for the safety of others. For the avoidance of doubt, Gross Negligence must be more than any mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadvertence or simple inattention. As used herein, "Willful Misconduct" means conduct intentionally aimed to cause harm to Client, or theft, forgery or misconduct of a fraudulent or criminal nature.

**7.4 No Consequential Damages.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NEITHER ADP NOR CLIENT WILL BE RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR OTHER SIMILAR DAMAGES (INCLUDING LOST PROFITS) THAT THE OTHER PARTY MAY INCUR OR EXPERIENCE IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES, HOWEVER CAUSED AND UNDER WHATEVER THEORY OF LIABILITY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The foregoing exclusion shall not apply to claims for consequential damages arising from ADP's breach of Section 6.3 of Annex A; provided however, that any consequential damages recovered by Client in a calendar year for such claims will be subject to the Confidentiality Breach Limit set forth in Section 7.3 of Annex A.

**SECTION 8        TERM AND TERMINATION.**

**8.1 Initial Term.** This Agreement is effective on the Effective Date. The initial term ("Initial Term") of this Agreement starts on the Effective Date and ends on the termination date set forth in the Pricing Appendix (the "**Termination Date**"). The Termination Date may be modified by Amendment.

**8.2 Renewals.** After the Initial Term, this Agreement will renew for additional one-year periods (each, a "Renewal Period") unless terminated by either party upon at least 90 days prior written notice to the other prior to the end of the Initial Term or Renewal Period, as applicable. During any Renewal Period either party may terminate this Agreement without cause upon at least 60 days' prior written notice to the other party.

**8.3 Termination by Client.** In addition to any termination rights in other Annexes, if (I) ADP fails to perform any material obligation under this Agreement and that failure continues for 60 days after ADP receives written notice from Client specifying

in reasonable detail the nature of that failure, or (ii) a Termination Event occurs with respect to ADP, Client may terminate this Agreement by further written notice to ADP.

**8.4 Termination by ADP.** In addition to any termination rights in other Annexes, if (i) Client fails to pay any amount due under this Agreement within 30 days after ADP has notified Client that it has failed to pay such amount by the due date therefor, (II) Client fails to perform any other material obligation and that failure continues for 60 days after Client receives written notice from ADP specifying in reasonable detail the nature of that failure, or (iii) a Termination Event occurs with respect to Client, ADP may terminate this Agreement by further written notice to Client. At ADP's option, ADP may, in the event of delinquent payment pursuant to clause (i), suspend the affected Services upon five (5) Business Day's prior written notice to Client, and ADP shall have no liability to Client for such suspended Services.

**8.5 Buy Out Fee.** If Client terminates any or all of the Services prior to the Termination Date for any reason except those in Section 8.3, or if ADP terminates this Agreement pursuant to Section 8.4, Client will pay to ADP a buy-out fee ("Buy Out Fee") equal to fifty percent (50%) of A multiplied by B, where A equals the number of months remaining prior to the Termination Date at the effective date of termination, and B equals the average monthly fee for the terminated Services during the twelve-month period immediately preceding the termination (or a shorter period of time if monthly fees have been payable for less than twelve months at the termination date). In the case of a partial termination, ADP may equitably adjust the fees for the remaining Services, and Client will be responsible for fees for any reconfiguration work. Payroll Services may not be terminated without also terminating PayForce Services or ADP Enterprise Services, if either is included. If monthly fees for Services have not yet been payable at the time of termination, B will equal the estimated monthly fees that would have been payable under this Agreement. Client's obligation to pay the Buy Out Fee will not affect its obligation to pay any Deferred Fee payable under this Agreement. Client will also pay the Buy Out Fee in the event of any reduction in Client's volume or usage of the Services by more than fifty percent.

**8.6 Effect of Termination.** Upon expiration or termination of this Agreement, or any Annex or Amendment or any Services for any reason, (i) all licenses and other rights granted to Client under the respective Annex or Amendment or in connection with the terminated Services, will become null and void, (ii) subject to the last sentence of Section 6.3 of Annex A, all materials provided by either party to the other under the respective Annex or Amendment or in connection with the terminated Services, will be returned within five Business Days after the effective date of termination, and (III) all earned and unpaid fees and expenses will become immediately due and payable. Each party's termination rights in this Agreement are cumulative and are in addition to all other rights and remedies available to the parties.

**8.7 Termination Assistance.** Upon termination of this Agreement, ADP will return copies of Client's data at ADP's standard rates and will cooperate with Client to provide for an orderly transfer of the Services to Client or Client's successor vendor ("Termination Assistance"). Such Termination Assistance will be provided at ADP's standard rates then in effect, and in no event will ADP be required to provide any ADP Confidential Information in connection with providing any Termination Assistance.



[***ANNEXA1624094-001 *17 *043942507998566088558354877809268074867203104854*4*5***]



**SECTION 9      MISCELLANEOUS PROVISIONS.**

**9.1  Amendment.**  This Agreement may not be modified except by a writing signed by the authorized representatives of ADP and Client.

**9.2  Notices.**  All communications required to be sent or given under this Agreement will be in writing and will be duly given and effective immediately if delivered in person or upon confirmation of signature recording delivery, if sent via a nationally recognized overnight courier service with signature notification requested, to Client at the address shown on the cover page of this Agreement or to ADP at the address shown in the Pricing Appendix or to any other address a party may identify in writing from time to time.  A copy of all communications to ADP of a legal nature must be sent to ADP, Inc., 400 W. Covina Blvd., MS 208, San Dimas, California 91773, Attention: Legal Department.

**9.3  Injunctive Relief.**  In the event of an actual or impending breach of Section 6.3 or 6.4, the non-breaching party, in addition to any remedy available at law, will be entitled to seek equitable relief, including injunction and specific performance.

**9.4  Entire  Agreement/Subcontractors.**  This Agreement, including the Annexes and Amendments, is the entire agreement and understanding between ADP and Client with respect to the subject matter and merges and supersedes all prior discussions, agreements and understandings of every kind and nature between them, and no party will be bound by any representation, warranty, covenant, term or condition other than as expressly stated in this Agreement. If any provision of an Annex or Amendment conflicts with a provision of another Annex or Amendment, the provision of each Annex or Amendment will govern, but solely with respect to the Services covered by such Annex or Amendment. Purchase Orders submitted by Client are for Client's internal administrative purposes only and the terms and conditions contained in those purchase orders will have no force and effect. The parties agree that this Agreement may be executed in multiple original copies, identically worded, and that each such executed copy shall constitute an original. Facsimile signatures, or signatures transferred in .pdf or similar format for scanned copies of documents, shall be treated as original signatures for all purposes. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns. Certain of the Services to be provided by ADP may be provided by subsidiaries of Automatic Data Processing, Inc. or by ADP's subcontractors, and ADP shall be responsible for the performance of those subsidiaries and subcontractors. Mailing and delivery service providers are not ADP's subcontractors, and ADP will not be responsible for the acts or omissions of such mailing and delivery service providers.

**9.5  No  Third  Party  Beneficiaries.**  Nothing in this Agreement creates, or will be deemed to create, third party beneficiaries of or under this Agreement. CLIENT AGREES THAT OTHER THAN ADP'S OBLIGATIONS TO CLIENT IN THIS AGREEMENT, ADP HAS NO OBLIGATION TO ANY THIRD PARTY (INCLUDING, WITHOUT LIMITATION, CLIENT'S EMPLOYEES AND/OR ANY TAXING AUTHORITIES) BY VIRTUE OF THIS AGREEMENT.

**9.6  Force Majeure.**  Any party to this Agreement will be excused from performance under this Agreement for any period of time that the party is prevented from performing its obligations under this Agreement due to an act of God, war, earthquake, civil disobedience, court order, or other cause beyond the party's reasonable control. Such non-performance will not constitute grounds for default.

**9.7  Waiver/Headings/Severability/Survival/Governing Law.**  The failure by any party to this Agreement to insist upon strict performance of any provision of this Agreement will not constitute a waiver of that provision. The section headings in this Agreement are intended for convenience of reference and will not affect its interpretation. If any provision of this Agreement is held invalid, illegal, or unenforceable. the validity, legality or enforceability of the remainder of this Agreement will not in any way be affected or impaired. The provisions of Section 6.3, 7.3 and 7.4 will survive the termination of this Agreement. This Agreement will be governed by and construed in accordance with the internal laws of the State of New York.

**9.8  ADP's Client List.**  ADP may include Client's name and corporate logo on ADP's client list

[***ANNEXA1624094-001 *17 *0439425079985660885583548778092680748672031048545*5*5***]



**SECTION 1    ADP EMPLOYMENT TAX SERVICES.**

**1.1 Description of the ADP Employment Tax Services.** ADP will provide to Client and Client will receive the tax filing services set forth on the Pricing Appendix attached hereto (the "**ADP Employment Tax Services**"). Based upon the information supplied by or on behalf of Client, ADP will make all applicable payroll-related deposits, filings and reconciliations (not including the filing or depositing of excise, sales, use, corporate or similar taxes) included in the ADP Employment Tax Services. Client will receive access to the ADP Tax Locator that provides certain capabilities to help locate municipal, school district, county and state codes and tax rates for new hires and transferred employees based upon their work and home addresses.

**1.2 Accuracy of Data.** Client is solely responsible for the accuracy of all payroll and other data provided to ADP by Client or Client's third-party payroll service provider including, without limitation, data Client generates and uses from the ADP Tax Locator or any other third-party provided functionality to the extent Client utilizes such functionality. Client is responsible for any errors or omissions caused by any third-party payroll service provider.

**1.3 Additional Documents.** Client will execute and deliver to ADP copies of the Reporting Agent Authorization, Client Account Agreement and such other limited powers of attorney and other documents, forms or instruments necessary for ADP to render to Client the ADP Employment Tax Services.

**1.4 Conversion of Data.** ADP shall, to the extent applicable, convert the applicable Client files, data bases and other information (the "Client Files") necessary for Client to use the ADP Employment Tax Services to a format compatible with ADP's software programs. Client will cooperate with and provide ADP with all necessary information and assistance required for ADP to successfully convert the Client Files. Without limiting Section 2.3 of Annex A, Client agrees to follow instructions ADP may provide relating to ADP Products and tools and reports provided by ADP, and to testing extracts and validating information processed by ADP. Client will assign a liaison person to assist and cooperate with ADP in such conversion. ADP shall, to the extent applicable, determine in accordance with its normal acceptance procedures when the applicable Client Files have been successfully converted and when the ADP Employment Tax Services are operational and available for Client's use.

**1.5 Grant of License.** Client's use of any pre-packaged third-party software will be governed by the terms and conditions of the applicable third-party license agreements delivered to Client hereunder with such pre-packaged third-party software. Client's use of the Application Programs delivered to Client in connection with the ADP Employment Tax Services will be governed by the license agreement (whether written, shrink-wrapped or on-line) delivered to Client hereunder with such Application Programs; provided, however, that in the event that no license agreement is delivered to Client with such Application Programs, ADP hereby grants to Client a personal, non-exclusive, non-transferable right and license to use solely for the internal business usage of the Client Group the Application Programs delivered to Client in connection with the ADP Employment Tax Services. Client will not have any interest in the Application Programs, except for the license granted to it under this Agreement. Without limitation of the

foregoing, Client will not copy, recompile, disassemble, reverse engineer, or make or distribute any other form of or any derivative work from, the Application Programs.

**1.6 Improvements, Enhancements, etc.** ADP will deliver to Client, at no additional cost, all improvements, enhancements, modifications and updates to any Application Programs that are included in the ADP Employment Tax Services if and as they are made generally available by ADP to its other clients at no additional cost. All other improvements, enhancements, modifications and updates to any Application Programs will be made available by ADP to Client at ADP's then prevailing prices. All such improvements, enhancements, modifications and updates may, if applicable, be delivered to Client in the form of computer media and will be installed by Client. If, at the election of Client, such improvements, enhancements, modifications and/or updates to the Application Programs are not installed prior to the release of two subsequent versions of the Application Programs, ADP will have no further obligation to provide Client with support of the Application Programs and the ADP Employment Tax Services may be unavailable to Client until such current Application Programs are installed by the Client.

**1.7 Important Tax Information (IRS Disclosure):** Notwithstanding Client's engagement of ADP to provide the ADP Employment Tax Services, the Internal Revenue Service wishes Client to know that Client is responsible for the timely filing of payroll tax returns and the timely payment of payroll taxes for its employees. The Internal Revenue Service wishes Client to know that it recommends that employers enroll in the U.S. Treasury Department's Electronic Federal Tax Payment System (EFTPS) to monitor their accounts and ensure that timely tax payments are being made for them, and that online enrollment in EFTPS is available at www.eftps.gov; an enrollment form may also be obtained by calling (800) 555-4477; that state tax authorities generally offer similar means to verify tax payments; and that Client may contact appropriate state offices directly for details.

**SECTION 2    FUNDING OF OBLIGATIONS.**

**2.1 Remittance of Funds.** Client will remit or otherwise make available to ADP sufficient good and available funds within the deadline established by ADP and via the method of delivery required by ADP to cover Client's tax filing obligations. ADP shall have no obligation to file Client's taxes absent timely funding. ADP will apply such funds to satisfy Client's tax filing obligations covered by the ADP Employment Tax Services.

**2.2 Investment Proceeds.** IF ADP RECEIVES CLIENT'S FUNDS IN ADVANCE OF THE TIME ADP IS REQUIRED TO APPLY SUCH FUNDS TO THE CLIENT'S TAX FILING OBLIGATIONS AS PART OF THE ADP EMPLOYMENT TAX SERVICES, ALL INVESTMENT EARNINGS AND PROCEEDS ON SUCH FUNDS, IF ANY, WHILE SUCH FUNDS ARE HELD BY ADP WILL BE FOR THE SOLE ACCOUNT OF ADP.

**2.3 Commingling of Funds.** ADP may commingle Client's funds with similar funds from other clients and with similar ADP and ADP-administered funds. ADP has a funds control system that maintains general ledger entries by client and by jurisdiction for tax liability deposits.

[***ANNEXE1624094-001 *14 *460973918738119028478280865374127037308190183142*1*2***]



**SECTION 3    FURTHER LIMITATION OF LIABILITY.**

The provisions of this Section 3 supplement the provisions of Section 7 of Annex A hereto. If as a result of an error or omission made by ADP in performing the ADP Employment Tax Services hereunder, an applicable taxing authority imposes a penalty on or assesses interest against Client, ADP will (i) pay all penalties resulting from ADP's error or omission, (ii) pay any interest charges imposed on Client for the failure to pay funds to the extent and for the period that such funds were held by ADP. In any such case, Client will be responsible for all additional taxes and any other interest charges not resulting from ADP's error or omission. The provisions of this Section 3 will only apply if (iii) Client permits ADP to act on Client's behalf in any communications and/or negotiations with the applicable taxing authority that is seeking to impose any such penalties or interest and (iv) Client assists ADP as reasonably required by ADP.

**SECTION 4    ADDITIONAL TERMINATION.**

**4.1 Basis of Termination.** If (i) Client fails to comply with any provision of Section 2.1 and (ii) such failure, in ADP's reasonable opinion, creates a risk of loss of funds to ADP (based upon ADP's standard procedures), ADP may, in its sole discretion and upon notice to Client, immediately terminate the ADP Employment Tax Services under this Agreement. If the ADP Employment Tax Services are terminated by ADP pursuant to this Section 4.1, Client will immediately (i) be responsible for payment of Client's tax filing obligations, including, without limitations, any penalties and interest accruing after the date of such termination, (ii) reimburse ADP for all tax filing obligations paid by ADP on behalf of Client and theretofore not paid or reimbursed by Client, and (iii) pay any and all fees and charges invoiced by ADP to Client relating to the ADP Employment Tax Services. Notwithstanding Section 8.7 of Annex A, if the ADP Employment Tax Services are terminated and not transferred to another ADP service provider, Client's access to ADP websites containing Client's data will expire and Client will be responsible for downloading all relevant data, including Statements of Deposit (SODs), prior to the expiration of such access.

**4.2 Reinstatement after Termination.** If ADP terminates the ADP Employment Tax Services pursuant to Section 4.1 and Client determines that its failure to comply with the provisions of Section 2.1 was the result of a clerical error, Client may request in a writing delivered to ADP (a "**Reinstatement Request**") that ADP reinstate the ADP Employment Tax Services. The Reinstatement Request shall be certified by an executive officer of Client and include a detailed description of the circumstances surrounding Client's failure to comply with the provisions of Section 2.1. If ADP agrees, in its reasonable discretion, that Client failed to comply with the provisions of Section 2.1 because of a clerical error, ADP will reinstate Client's ADP Employment Tax Services at the earliest date reasonably possible.

**4.3 Additional Requirements.** If Client fails to comply with the provisions of Section 2.1, as a condition to continuing to provide the ADP Employment Tax Services, ADP may require Client to pay all outstanding and future tax filing obligations covered by the ADP Employment Tax Services and/or all ADP fees and charges for the Services hereunder to ADP by (i) bank or certified check, (ii) wire transfer of immediately available funds, and/or (iii) in advance of the then current schedule.

**4.4 Termination of ADP Tax Locator.** ADP may terminate the ADP Tax Locator feature of the ADP Employment Tax Services at any time by providing 30 days written notice to Client.

[***ANNEXE1624094-001 *14 *4609739187381190284782808653741270373081901 83142*2*2***]



**ANNEX G**
**ADP PRINT: W2 MANAGEMENT, CHECK, AND IPAY**
Client: Belcan Services Group II

**SECTION 1     ADP PRINT: W2 MANAGEMENT, CHECK, AND IPAY.**

**1.1   Print Services.** ADP will provide the print services specified in the Pricing Appendix (collectively, the "**Print Services**") to the Client in accordance with the terms of this Agreement.

**1.2   Delivery of Information.** Client will deliver to ADP within the time frames established by ADP from time to time, the information necessary to print the materials to be printed pursuant to the Print Services. ADP will accept inbound data transmissions from Client customers and/or, as appropriate, from Client according to mutually agreed-upon schedules and communications protocols.

**1.3   Use of Logo.** In the event that Client desires ADP to reproduce Client's (or any other) logo or other intellectual property (collectively, "Client Logo") on any printed items prepared for Client by ADP in its performance of the Print Services, Client will provide ADP with a written request for such usage, setting forth the specific manner of usage desired, and including, whether electronically or otherwise, an exact copy of the Client Logo as Client desires such Client Logo to appear on such printed items. Upon ADP's receipt of such written notice from Client, Client will be deemed to have granted ADP a limited license to reproduce Client Logo on such printed items prepared by ADP in its performance of the Print Services.

**1.4   Client Responsibility for IPay Statements.** Notwithstanding the provisions of Section 2 of Annex A, Client will be exclusively responsible for compliance with all laws and governmental regulations with respect to ADP iPay Statements, which allows clients and client employees to view pay information via the Internet.

[***ANNEXG1624094-001 *14 *6993085326122082213979124286476794230583813129351*1***]



**ANNEX W**
**ADP WAGE GARNISHMENTS**
Client: Belcan Services Group II

**SECTION 1 ADP WAGE GARNISHMENTS SERVICES.**

**1.1 Description of the ADP Wage Garnishments Services.** To the extent set forth on Annex Z and in accordance with applicable service specifications, ADP and Client agree that ADP will provide Client with (i) wage garnishment order evaluation and processing, (ii) wage garnishment payment processing, (iii) voluntary wage deduction processing, (iv) third party wage garnishment order response services and (v) call center support services (the "**ADP Wage Garnishments Services**"). ADP will act solely in the capacity of a third party service provider of garnishment data evaluation and data and payment processing. ADP may from time to time provide Client reasonable instructions which Client will follow. However, the ADP Wage Garnishments Services are not a substitute for the advice of an attorney. Client acknowledges and agrees that ADP is not a law firm, does not provide legal advice or representation, and that no attorney-client relationship exists or will be formed between ADP and Client.

Notwithstanding Section 2.3 of Annex A, ADP will be responsible for (i) processing garnishment orders received from Client, (ii) populating notifications (court filed and child support) with Client provided data on behalf of Client and providing for Client's signature as directed by Client, (iii) responding to and coordinating responses to agencies, custodial parents and other parties, as applicable, and (iv) disbursement of garnishment payments to the appropriate payee (which may include custodial parents, credit/tax agencies, state disbursement units, etc.) in the appropriate format (check, EFT, direct deposit, etc.) at the specified time (day after check date, monthly, etc.) based on the data file received from Client each payroll (indicating what was withheld from the employee, terminations, changes to employee pay, etc.).

**1.2 Court Filed Notifications.** Client acknowledges that it will be provided with and review a copy of each form of notification produced by ADP that is prepared for, submitted to and/or filed with a court of law (each, a "**Court Filed Notification**") as part of the ADP Wage Garnishments Services and hereby directs ADP to utilize such Court Filed Notifications on Client's behalf. ADP shall be responsible for (i) monitoring changes in applicable rules that impact the format of each Court Filed Notification, (ii) implementing changes to the Court Filed Notification forms as deemed necessary, in ADP's reasonable discretion, to address such changes in applicable rules, and (iii) notifying Client of any changes by providing Client with a copy of any modified Court Filed Notification form. Notwithstanding the foregoing, Client will be responsible for making its own determination as to the legal sufficiency of each form, as modified by ADP from time to time, and their continued use by ADP on Client's behalf in each jurisdiction. Client shall be responsible for providing a consenting party (including any required notarization) to execute each Court Filed Notification created by ADP on Client's behalf. Except for ADP's obligations stated in this Section 1.2, ADP shall not be liable hereunder to Client or any third party for the legal sufficiency of the format of any Court Filed Notification utilized by Client hereunder.

**1.3 Accuracy and Timeliness of Data.** Client is solely responsible for the accuracy and timeliness of all payroll and other data provided to ADP by Client or any Client third-party service provider. Client is also responsible for (i) the way in which Client's

payroll system utilizes data passed by ADP to Client in connection with ADP's provision of the ADP Wage Garnishments Services, (ii) any errors or omissions caused by any of Client's third-party service providers, and (iii) any liabilities resulting from Client's failure to timely provide ADP with information or documentation necessary for ADP to provide the ADP Wage Garnishments Services.

**1.4 Additional Documents.** Client will execute and deliver to ADP copies of such documents, forms or instruments necessary for ADP to render to Client the ADP Wage Garnishments Services.

**1.5 Access to Data.** Client will cooperate with and provide ADP with access to all information necessary for ADP to provide the ADP Wage Garnishments Services. Client will assign a liaison person to assist and cooperate with ADP in such matters.

**1.6 Improvements, Enhancements, etc.** ADP will deliver to Client, at no additional cost, all improvements, enhancements, modifications and updates to the ADP Wage Garnishments Services if and as they are made generally available by ADP to its other ADP Wage Garnishments Services clients at no additional cost. All other improvements, enhancements, modifications and updates to the ADP Wage Garnishments Services will be made available by ADP to Client at ADP's then prevailing prices. All such improvements, enhancements, modifications and updates may, if applicable, be delivered to Client in the form of computer media and will be installed by Client. Client acknowledges and agrees that ADP will not be liable to Client for any degradation to the ADP Wage Garnishments Services or errors that occur as a result of Client's failure to implement any improvements, enhancements, modifications and/or updates to the ADP Wage Garnishments Services (including associated client interfaces) that ADP reasonably determines are necessary to ADP's provision of the ADP Wage Garnishments Services.

**1.7 ADP Performance of Services.** Client authorizes ADP to (i) use Client's data to populate document templates and create garnishment responses and other standard form documents; (ii) file electronic documents on Client's behalf and at its direction where permitted by the relevant court or agency; and/or (iii) prepare and serve written notices to third parties on Client's behalf and at its direction. ADP's performance of the ADP Wage Garnishments Services shall be in accordance with and subject to the documents, policies, directives, rules, practices and procedures for such administration provided to ADP by Client or by third parties (such as courts, attorneys and agencies) to the extent that Client has directed ADP and ADP has agreed to accept such documents, policies, directives, rules, practices and procedures for such administration from such third parties. In the event ADP shall have any questions relating to the application of same to a particular set of facts, or if an employee of Client notifies ADP of his or her objection to ADP's evaluation or application of the same, then ADP shall notify Client of such questions or objections. Client shall be responsible for obtaining answers to any such questions or resolving such objections and ADP shall be entitled to rely upon such answers and to follow any directions communicated by Client. Client authorizes ADP to release employee-related data to applicable courts of law, other third party vendors of Client as are designated by Client from time to time or to the extent necessary to provide the ADP Wage Garnishments Services.

---

[***ANNEXW1624094-001 *14 *0370166394615435284449014596250604384852061558 45*1*3***]



**1.8  Client Indemnity.**  Client shall indemnify, defend and hold ADP harmless from and against any and all liabilities, claims, penalties, damages, forfeitures, suits, and the costs and expenses incident thereto (including the costs and expenses of defense, settlement and reasonable attorneys' fees), arising from or claimed to have arisen from the performance by ADP of the ADP Wage Garnishments Services, including any such liability, claims, damages, costs or expenses arising from or claimed to have arisen from actions ADP performs in connection with ADP Wage Garnishments Services pursuant to any data supplied by Client or any instruction, request or representation of Client, except to the extent such liability, claims, damages, costs or expense arise from the negligence or willful misconduct of ADP.  ADP shall be under no duty to review any such Client data, instruction, request or representation.

**SECTION 2    FUNDING OF OBLIGATIONS.**

**2.1  Remittance of Funds.**    Client will remit or otherwise make available to ADP sufficient, good and available funds within the deadline established by ADP and via the method of delivery required by ADP to cover Client's wage garnishment payment obligations.  ADP will apply such funds to satisfy Client's wage garnishment filing obligations covered by the ADP Wage Garnishments Services.

**2.2  Investment Proceeds.**    IF ADP RECEIVES CLIENT'S FUNDS IN ADVANCE OF THE TIME ADP IS REQUIRED TO APPLY SUCH FUNDS TO THE CLIENT'S WAGE GARNISHMENT FILING OBLIGATIONS AS PART OF THE ADP WAGE GARNISHMENTS SERVICES, ALL INVESTMENT EARNINGS AND PROCEEDS ON SUCH FUNDS, IF ANY, WHILE SUCH FUNDS ARE HELD BY ADP WILL BE FOR THE SOLE ACCOUNT OF ADP.

**2.3  Commingling of Funds.**  ADP may commingle Client's funds with similar funds from other clients and with similar ADP and ADP-administered funds.  ADP utilizes a funds control system that maintains general ledger entries by client.

**SECTION 3    ADDITIONAL TERMINATION.**

**3.1  Basis of Termination.**  If (i) Client fails to comply with any provision of Section 2.1 and (ii) such failure, in ADP's reasonable opinion, creates a risk of loss of funds to ADP (based upon ADP's standard procedures), ADP may, in its sole discretion and upon notice to Client, immediately terminate the ADP Wage Garnishments Services under this Annex W. In addition, if ADP reasonably determines that it can no longer provide all or any portion of the ADP Wage Garnishments Services due to changes in applicable law or application of existing law, ADP may, in its sole discretion and upon notice to Client, immediately terminate the applicable portion of the ADP Wage Garnishments Services.  If the ADP Wage Garnishments Services are terminated by ADP pursuant to this Section 3.1, Client will immediately (i) be responsible for payment of Client's wage garnishment and voluntary deduction amounts associated with that portion of the ADP Wage Garnishments Services terminated by ADP not otherwise collected from Client by ADP including, without limitation, any judgments, court costs, legal fees, and/or interest accruing after the date of such termination, (II) be responsible for its garnishment answer and filing obligations, (III) reimburse ADP for all such payment obligations paid by ADP on behalf of Client and

theretofore not paid or reimbursed by Client, and (iv) pay any and all fees and charges invoiced by ADP to Client relating to the ADP Wage Garnishments Services.

**3.2  Reinstatement after Termination.**  If ADP terminates the ADP Wage Garnishments Services pursuant to Section 3.1 and Client determines that its failure to comply with the provisions of Section 2.1 was the result of a clerical error, Client may request in a writing delivered to ADP (a **"Reinstatement Request"**) that ADP reinstate the ADP Wage Garnishments Services.  The Reinstatement Request shall be certified by an executive officer of Client and include a detailed description of the circumstances surrounding Client's failure to comply with the provisions of Section 2.1.  If ADP agrees, in its reasonable discretion, that Client failed to comply with the provisions of Section 2.1 because of a clerical error, ADP will reinstate Client's ADP Wage Garnishments Services at the earliest date reasonably possible.

**3.3  Additional Requirements.**  If Client fails to comply with the provisions of Section 2.1 and ADP chooses in its discretion to not terminate this Annex W, as a condition to continuing to provide the ADP Wage Garnishments Services, ADP may require Client to pay all outstanding and future wage garnishment payment obligations covered by the ADP Wage Garnishments Services and/or all ADP fees and charges for the ADP Wage Garnishments Services hereunder to ADP by (i) bank or certified check, (II) wire transfer of immediately available funds, and/or (III) in advance of the then current schedule.

**SECTION 4    ELECTRONIC INCOME WITHHOLDING ORDERS PROGRAM.**

**4.1  Authorization.**  To the extent the Electronic Income Withholding Orders Program (the **"e-IWO Program"**) is available in any particular jurisdiction, Client authorizes ADP as its third party service provider to receive from the Office of Child Support Enforcement (the **"OCSE"**) electronic income-withholding orders/notices issued by all states/tribes/territories participating in the e-IWO Program.  Client also authorizes ADP to rely on the documents and information provided to it by the OCSE and to handle and process income-withholding orders/notices electronically transmitted to it in the same manner as if they were received from Client.

**4.2  ADP Obligation.**  ADP's sole obligation with respect to the e-IWO Program is to handle and process income-withholding orders/notices that are actually received by it from the OSCE.  ADP shall not be liable or deemed to be in default for any act, failure to act, negligence or bad faith by any state/tribe/territory or the OCSE.

**4.3  Client Obligation.**  In order to participate in the e-IWO Program, Client must provide to ADP the information necessary to provide this functionality.  For the jurisdictions participating in the e-IWO program, Client shall continue to forward any and all income-withholding orders/notices or related documentation or information received by it to ADP.

**4.4  Mechanics of the e-IWO Program.**  Client understands that there is a 30-day start up period in which orders will convert from hard-copy documents mailed to Client to the electronic method.  Client agrees to provide written notice to ADP

[***ANNEXW1624094-001 *14 *037016639461543528444901459625060438485206155845*2*3***]



at least 45 days in advance if it wishes to no longer participate in the e-IWO Program. Client also acknowledges and agrees that ADP may, at its sole discretion, discontinue participation in the e-IWO Program at any time.

Client understands that any electronic income-withholding orders received by ADP as its third party service provider shall be considered records generated during the ordinary course of business and that the electronic income-withholding orders received by ADP shall be considered admissible as evidence in the same manner as paper documents.



[***ANNEXW1624094-001 *14 *03701663946154352844490145962506043848520615585*3*3***]



**Pricing Appendix**
**Service and Fee Schedule**
Client: Belcan Services Group II

**SECTION 1      THE CLIENT GROUP.**

Belcan Services Group II

**SECTION 2      ADDRESS OF ADP FOR NOTICES.**

ADP, Inc.
400 W. Covina Blvd., MS 208
San Dimas, CA 91773

**SECTION 3      TERMINATION DATE.**

The termination date is that date which is the 2 year anniversary of the Effective Date.

**SECTION 4      FEE EFFECTIVENESS; FEE CHANGES.**

The fees set forth on Pricing Appendix will remain fixed for 2 years following the Effective Date. Thereafter, ADP may modify the fees for the Services and will give Client at least 30 days prior written notice of any changes in such fees.

**SECTION 5      ADP EMPLOYMENT TAX SERVICES AND FEES.**

**EMPLOYMENT TAX SERVICES:**
**Processing Assumptions**

| | |
|---|---|
| ADP Employment Tax Services Company Codes | 1 |
| Billable Jurisdictions | 75 |
| Employees | 6,125 |

**Processing**

| | |
|---|---|
| Flat Fee Pricing | $1,950.00 per month* |

* Notwithstanding Section 4 of this Pricing Appendix, if the stated Processing Assumptions increase by 10 % or greater, ADP may increase the above Monthly Flat Fee on the new Processing Assumptions based on the schedule of fees applicable to this agreement.

| | |
|---|---|
| Per ADP Employment Tax Services Company Code | $50.00 per month |
| Per Billable Jurisdiction | $25.00 per month |
| Per Employee | $0.00 per month |

| | |
|---|---|
| Transporter Interface Maintenance | Waived |

| | |
|---|---|
| Filing & Deposits for all EIN's (currently 1) | Included |
| Filing & Deposits for all State's (currently 12) | Included |
| Filing & Deposits for all Local Jurisdictions (currently 191) | Included |
| Annual Processing, Reconciliations and Filings | Included |
| 24x7 Access to ADP Tax Service Website | Included |
| Advise of Debt | Included |
| Manual/Reverse Deposits | Included |
| Agency Inquiry Response-Unlimited Volume | Included |
| Copies of Quarterly Statements | Included |
| Late Receipt of Files: Periodic/Quarterly/Annual Data | Included |
| Statement of Payments | Included |
| Wire Transfer-client initiated | Included |

**Implementation**

| | |
|---|---|
| Set-Up Fee and ADP Transporter Interface Base Fee | Waived |

**Optional Items / Services**



[***ANNEXZ1624094-001 *27 *6345696344425690656626167744789659056587760041421*1*3***]



**Pricing Appendix**
**Service and Fee Schedule**
Client: Belcan Services Group II

| | |
|---|---|
| Amended Quarterly Return | $100.00 per occurrence |
| Amended Annual Reconciliation Return | $100.00 per occurrence |
| Amended W-2 (agency filing copy) | $2.65 per employee |
| Applied for Fee | $25.00 per occurrence |
| Report Reproductions | $25.00 per report, plus $1.00 per page |
| Hard Copy Closes and Exceptions | $100.00 per occurrence |
| Tax Registration | $150.00 per jurisdiction |
| Tax Locator: | |
| Subscription Fee (invoiced annually in advance) | $175.00 per month |

**Tax Liability Impounding Schedule**
- All tax liabilities will be provided to ADP via reverse wire .
- Federal withholding, FICA EE/ER, Medicare EE/ER state withholding and local withholding, FUTA and SUI withholding and local withholding taxes will be provided to ADP one business day prior to the associated payroll check date.
- For all reverse wire clients, funds must be available by 6:00 AM PST.

**SECTION 6      PRINT SERVICES AND FEES.**
**IPAY:**
**Processing**

| | |
|---|---|
| Check/Voucher Posting | $0.13 per page |
| IVR | Included |

**Implementation**

| | |
|---|---|
| iPay | $0.00 |

**Optional Items / Services**

| | |
|---|---|
| Single Sign-On (Federation) | $5,000.00 |
| Single Sign-On | $0.03 per page |

**W2 YEAR-END:**
**Processing**
W2:

| | |
|---|---|
| Annual Base Fee | $500.00 per processing |
| Minimum Processing | $2,500.00 per file processed |
| Printing | $0.75 per W2 page printed |
| Territories Included (Guam, Puerto Rico, Virgin Islands | $250.00 minimum per file processed |
| Postage: | |
| Domestic Postage and Handling | then current First-Class postage rate |
| Mexico, Canada and Foreign Postage and Handling | then current First-Class postage rate |
| Additional Inserts (inserted only)* | $0.10 per item in envelope and/or $3.00 per package |

*Pricing for printing and folding inserts will be provided for each occurrence and will be based on the document to be printed and folded.

| | |
|---|---|
| Late Client Files (subject to late fee) | $250.00 per late file processed |
| One CD-Rom with W2 Images | included |

W2 iPay:

| | |
|---|---|
| Posting | Included |

All delivery charges are the responsibility of the Client during implementation and production processing. Once ADP provides the printed documents to the client's designated carrier (e.g. courier or USPS) ADP has fulfilled distribution requirements.

**Implementation**
W2:

| | |
|---|---|
| First Year Only | Waived |

W2 iPay:

| | |
|---|---|
| First Year Only | $0.00 per company code |

**Optional Items / Services**

| | |
|---|---|
| Additional CD-ROM | $150.00 per CD copy |
| W2 Files for CD Output Only (reruns) | $500.00 per CD; plus |
| | $0.05 per W2 item |
| Files Processed for Manual Transmission to TaxPartner | $250.00 per file processed |
| W2 Federal Magnetic Tape | $150.00 per file |
| Employer Copies | $0.15 each |
| 1099's | $1.00 each |
| Single Sign-On (Federation) | $5,000.00 |
| Single Sign-On | $0.03 per page |

[***ANNEXZ1624094-001 *27 *634569634442569065662616774478965905658776004142*2*3***]

E-FILED 11/07/2023 9:40 AM  /  CONFIRMATION 1391480  /  A 2304792  /  COMMON PLEAS DIVISION  /  IFIJ



**Pricing Appendix**
**Service and Fee Schedule**
Client: Belcan Services Group II

**SECTION 7      ADP WAGE GARNISHMENTS SERVICES AND FEES.**

**Comprehensive with Withholding Order Pre-Qualification**

**Monthly Fees**
Disbursement ............................................................................ $1.34 each
Withholding Order Pre-Qualification Process ................................. $3.00 each letter
Lien Analysis ............................................................................ $13.00 each
Transporter ............................................................................... $150.00 monthly
Minimum monthly fee* ................................................................ $500.00 monthly
*(Minimum monthly fee is in addition to monthly transporter fee)

**Implementation Fees**
Pay System ...........................................................................Great Plains
Number of Employees ..............................................................6125
One-time Implementation ..........................................................$0.00

**Optional Items / Services**
Manual Checks..........................................................................$16.00 each

**Funding**
Client will transmit wage garnishment information, deductions and liabilities to ADP one business day prior to the associated payroll check date via reverse wire .

▪ For all reverse wire clients, funds must be available by 6:00 AM PST.

**SECTION 8      EXPENSES.**

In addition to the fees listed in this Pricing Appendix, postage, delivery charges, other similar third party charges, and reasonable travel and out-of-pocket expenses are payable by Client.

[***ANNEXZ1624094-001 *27 *63456963444256906566261677447896590565877600414 2*3*3***]



**FIRST AMENDMENT**
Client: Belcan LLC

FIRST AMENDMENT

TO

MASTER SERVICES AGREEMENT

BETWEEN

**ADP, LLC**

AND

**BELCAN, LLC**
(PREVIOUSLY BELCAN SERVICES GROUP II)

This First Amendment (the "First Amendment"), made as of ~~DECEMBER 11, 2017~~ ("First Amendment Effective Date") between ADP, LLC ("ADP"), and Belcan LLC ("Client") contains changes, modifications, revisions and additions to the terms and conditions of the Master Services Agreement dated December 31, 2013 (the "Agreement"), between Client and ADP.

Now, therefore, in consideration of the mutual covenants contained in the Agreement and herein, and for other good and valuable consideration, ADP and Client hereby agree as follows:

1. **Added Services.** As of the First Amendment Effective Date, and in addition to the Services provided by ADP under the Agreement, ADP will provide to Client and Client will receive from ADP the ADP Vantage HCM Services in accordance with Pricing Appendix-1 and on the terms and conditions set forth in Annexes C, G, I, T, and W-2 attached hereto and made a part hereof. As of the date on which live processing commences for ADP Vantage HCM Services, Annexes E, G, and W attached to and forming part of the Agreement shall be deleted from the Agreement in their entirety.

2. **Pricing Appendix-1.** All references to "Pricing Appendix" shall be deemed to refer to the "Pricing Appendix-1" for purposes of such added Services."

3. **Annexes E, G, and W.** As of the date on which live processing commences for ADP Vantage HCM Services, Annexes E, G, and W attached to and forming part of the Agreement shall be deleted from the Agreement in their entirety.

4. **Effect of First Amendment.** This First Amendment may be executed in multiple original copies, identically worded, and each such executed copy constitutes an original. Facsimile signatures, electronic signatures in connection with the electronic signature delivery system utilized by ADP and signatures transferred in .pdf or a similar format for scanned copies of documents are original signatures for all purposes of this First Amendment and the Agreement. All other terms and conditions of the Agreement shall remain in full force and effect. In the event of any conflict between the terms and conditions of this First Amendment and the terms and conditions of the Agreement, this First Amendment shall prevail. The terms defined in the Agreement and used in this First Amendment shall have the same respective meanings as set forth in the Agreement, unless clearly otherwise defined in this First Amendment.

# *2069203-02-W-22*

[***AMD1624094-003 *2 *39988377263256029828375948704372062167360939408 7*W*22***]



**FIRST AMENDMENT**
Client: Belcan LLC

**IN WITNESS WHEREOF**, the parties hereto have caused this First Amendment to be duly executed by its authorized representatives as of the date first above written.

**ADP, LLC**

By: _____

Name: **Alan Primeaux**

Title: Sr. Division Vice President, Implementation

Date: 12·11·2017

**BELCAN LLC**

By: _____

Name: Terry Williams

Title: CTO

Date: 12/4/2017

APPROVED AS TO FORM
ADP LEGAL
SPB

# *2069203-02-W-22*

[***AMD1624094-003 *2 *399883772632560298283759487043720621673609394087*W*22***]

**ADP Employment Tax Services**

Client desires to receive and ADP agrees to provide the following ADP Employment Tax Services to Client in addition to those already provided under the Agreement.

1. **Definitions.** Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed that term in the Agreement.

    1.1. **"Client Content"** means all information and materials provided by Client, its agents or employees, regardless of form.

    1.1. **"Payee"** means any intended recipient of payments under the Payment Services and may include Client's employees, taxing authorities, governmental agencies, suppliers, benefit carriers and/or other third parties; provided that in the case of ADP Wage Payment Services, Payee shall be limited to Client's employees and independent contractors.

    1.2. **"Payment Services"** means Services that involve electronic or check payments being made by ADP to third parties on Client's behalf and at its direction.

2. **Service Summary.**

    2.1. **ADP Employment Tax Services.** Coordination of payroll-related tax and/or regulatory agency deposits, filings, and reconciliations on behalf of employers.

3. **Additional Terms.** The following additional terms and conditions apply to the ADP Employment Tax Services:

    3.1. **Important Tax Information (IRS Disclosure).** Notwithstanding Client's engagement of ADP to provide the ADP Employment Tax Services in the United States, please be aware that Client remains responsible for the timely filing of payroll tax returns and the timely payment of payroll taxes for its employees. The Internal Revenue Service recommends that employers enroll in the U.S. Treasury Department's Electronic Federal Tax Payment System (EFTPS) to monitor their accounts and ensure that timely tax payments are being made for them, and that online enrollment in EFTPS is available at www.eftps.gov; an enrollment form may also be obtained by calling (800) 555-4477; that state tax authorities generally offer similar means to verify tax payments; and that Client may contact appropriate state offices directly for details.

    3.2. **Additional Termination Provisions for ADP Employment Tax Services.** If the ADP Employment Tax Services are terminated, Client's access to ADP websites containing Client's data will expire 90 days from the effective date of the termination, and Client will be responsible for downloading all relevant data, including Statements of Deposit (SODs) prior to the expiration of such access.

    3.3. **Additional Documentation.** In order for ADP to perform the ADP Employment Tax Services, it may be necessary for Client to execute and deliver additional documents (including reporting agent authorization, client account agreement, limited powers of attorney, etc.) and Client agrees to execute and deliver such additional documents.

    3.4. **Payments Services Terms.** The following additional terms and conditions apply to the ADP Employment Tax Services:

        3.4.1. **Suspension.** Without limiting the foregoing, the parties agree that Payment Services involve credit risk to ADP. Payment Services may be suspended by ADP (**A**) immediately following notice to Client (i) that Client has failed to remit sufficient, good

and available funds within the deadline and via the method of delivery set forth in Pricing Appendix 1 as it relates to the applicable Payment Services, or (ii) if Client breaches any rules promulgated by the National Automated Clearing House Association as it relates to ADP conducting ACH transactions on behalf of Client, and **(B)** with 24 hour notice if: (i) a bank notifies ADP that it is no longer willing to originate debits from Client's account(s) or credits for Client's behalf for any reason or (ii) the authorization to debit Client's account is terminated or ADP reasonably believes that there is or has been fraudulent activity on the account. If the Payment Services are terminated or suspended pursuant to Section 8.4 of Annex A or this Section, Client acknowledges that ADP shall be entitled to allocate any funds in ADP's possession that have been previously remitted or otherwise made available by Client to ADP relative to the Payment Services in such priorities as ADP may determine appropriate, including reimbursing ADP for payments made by ADP on Client's behalf to a third party. If the Payment Services are terminated by ADP, Client understands that it will (x) immediately become solely responsible for all of Client's third party payment obligations covered by the Payment Services then or thereafter due (including, without limitation, for ADP Employment Tax Services, any and all penalties and interest accruing after the date of such termination, other than penalties and interest for which ADP is responsible under Section 4 below), and (y) reimburse ADP for all payments properly made by ADP on behalf of Client to any payee, which has not been paid or reimbursed by Client. If the Payment Services remains suspended for 30 days, the affected Payment Service shall be deemed terminated on the 31st day following suspension.

**3.4.2.Client Credentialing.** Client understands and acknowledges that the implementation and ongoing provision of Payment Services are conditioned upon Client passing (and continuing to pass) a credentialing process that ADP may deem necessary in connection with the provision of Payment Services.

**3.4.3.Additional Requirements.** Payment Services may be subject to the rules and standards of any applicable clearing house, payment and/or card networks or associations. Client and ADP each agree to comply with all such rules and standards applicable to it with respect to the Payment Services.

**3.4.4.Funding Obligations.** Client acknowledges that ADP is not a lender. As such, as a condition to receiving services, Client will remit or otherwise make available to ADP sufficient, good and available funds within the agreed-to deadline and via the agreed-to method of delivery to satisfy all of Client's third-party payment obligations covered by the Agreement. ADP will apply such funds to satisfy such third-party payment obligations. ADP will not be required to provide Payment Services if ADP has not received all funds required to satisfy Client's third-party payment obligations. Client will immediately notify ADP if it knows or should know that it will not have sufficient funds to satisfy the amounts required in connection with the Payment Services. If Client has a material adverse change in its condition, ADP may modify the funding method or deadline by which funds must be made available to ADP for payment to Payees. Client agrees to pay to ADP upon demand any amounts that have been paid by ADP to satisfy Client's third party payment obligations prior to receiving such amounts from Client.

**3.4.5.Investment Proceeds; Commingling of Client Funds.** IF ADP RECEIVES CLIENT'S FUNDS IN ADVANCE OF THE TIME ADP IS REQUIRED TO PAY SUCH FUNDS TO THIRD PARTIES, ALL AMOUNTS EARNED ON SUCH FUNDS, IF ANY, WHILE HELD BY ADP WILL BE FOR THE SOLE ACCOUNT OF ADP. ADP may commingle Client's funds with similar funds from other clients and with similar ADP

and ADP-administered funds.  ADP utilizes a funds control system that maintains general ledger entries by client and/or by jurisdiction.

3.4.6. **Recovery of Funds; Stop Payment Requests.** Client agrees to cooperate with ADP and any other third parties to recover funds erroneously issued or transferred to any Payee or credited to any Payee's account. If Client desires to stop payment on any check or to recall or reverse any electronic payment, Client will provide ADP with a stop payment request in the form required by ADP.  Client acknowledges that ADP's placement of a stop order request is not a guarantee that such stop payment will occur.

4. **Further Limitation of Liability.**  The provisions of this Section 4 supplement the provisions of Section 7 of Annex A.  The limit on ADP's liability set forth in Section 7 of Annex A shall not apply to (i) interest charges imposed by an applicable taxing authority on Client for the failure by ADP to pay funds to the extent and for the period that such funds were held by ADP and (ii) all tax penalties resulting from ADP's error or omission in the performance of the ADP Employment Tax Services.  The provisions of this Section 4 shall only apply if (x) Client permits ADP to act on Client's behalf in any communications and negotiations with the applicable taxing authority that is seeking to impose any such penalties or interest and (y) Client assists ADP as reasonably required by ADP.

**Print and Online Statement Services**

Client desires to receive and ADP agrees to provide the following Services to Client in addition to those already provided under the Agreement.

1. **Service Summary.**

    1.1. **Print and Online Statement Services.** Print and distribution of payroll checks, pay statements, and/or year-end statements, as well as online posting of pay statements and/or year-end statements.

2. **Additional Terms.** The following additional terms and conditions apply to the Print and Online Statement Services:

    2.1. **Online Statements.** If Client instructs ADP to provide online pay statements, Forms W2, or Forms 1099 without physical copies thereof, Client will be exclusively responsible for determining if and to what extent Client's use of online pay statements, Forms W2 or Forms 1099 satisfies Client's obligations under applicable laws and the consequences resulting from such determinations.

**ADP Federated Single Sign On Services**

Client desires to receive and ADP agrees to provide the following Services to Client in addition to those already provided under the Agreement.

1. **Definitions**. Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed that term in the Agreement.

   1.1. **"Covered Services"** has the meaning set forth in Section 3.1.

   1.2. **"Identity Credentials"** has the meaning set forth in Section 3.1.

   1.3. **"Participants"** has the meaning set forth in Section 3.1.

   1.4. **"SAML"** has the meaning set forth in Section 3.2.2.

2. **Service Summary**.

   2.1. **Federated Single Sign On.** Provide federated single sign-on access from client's portal to ADP application(s).

3. **Additional Terms**. The following additional terms and conditions apply to the Federated Single Sign On Services:

   3.1. **Services Covered by Federated Single Sign-On.** ADP will provide Client with federated single sign on capabilities ("**FSSO**") that will allow Client to internally control the identity management and procedures with respect to end user provisioning/de-provisioning, authenticating, authorizing and enabling its designated employees ("**Participants**") to access the following Services (the "**Covered Services**") without utilizing ADP's identity management system and procedures: Vantage Services. ADP shall accept the credentials (as more fully described below, the "**Identifying Credentials**") of each Participant as accurately identifying the Participant and then provide the latter with access to the Covered Services.

   3.2. **Authentication/Authorization.**

      3.2.1. Client shall be responsible for the establishment, implementation and oversight of the rules, requirements and procedures relating to the provisioning, de-provisioning, distribution, selection, use and safeguarding of the Identifying Credentials (such as the user ID and passwords) and for the verification of the identity of each Participant and its respective level of access authorization for each Covered Service. Client shall utilize at least 'standard industry practices' in regards to password policies, user provisioning and de-provisioning, and the creation of persistent, unique and static user ID's, and therefore ADP shall not have any responsibility to authenticate Participants or otherwise verify their identity or authorized access levels (but ADP shall nonetheless retain the right to reject assertions as provided in Section 3.2.3).

      3.2.2. The FSSO shall solely utilize "Security Assertion Mark-up Language" ("**SAML**"). Client is responsible for procuring at its expense all hardware and software necessary to utilize the FSSO. The assertion exchange between Client and ADP will be performed through the use of industry accepted encryption for public networks for internet based communication encryption. ADP reserves the right to

further the security of the assertions through the use of such technologies that support digital signing. Client shall digitally sign the assertion being provided to ADP. ADP shall provide Client with the information to be collected, transmitted and validated as part of the assertion messages under the FSSO. ADP reserves the right to reject any such assertions based upon the contents of such assertions or upon any applicable ADP policies or access controls.

3.2.3.  FSSO may not apply with respect to certain specific functions (e.g. elevated security administrative roles) when additional security measures reasonably warrant not having FSSO (e.g. multi-factor authentication).

## 3.3. Implementation.

3.3.1.  ADP and Client shall work with each other in order to coordinate the testing and implementation of the FSSO, including any required idle timeout, account linking, session management, global logout techniques, as well end-user support process. The Client end-user support shall act on behalf of the Participants to investigate and answer any inquiries which may result from, relate to or be affected by the implementation or utilization of the FSSO.

3.3.2.  Client shall provide reasonable cooperation to assist with any additional network security features reasonably determined by ADP to be necessary to enhance the FSSO

3.3.3. Client shall promptly notify ADP of any security breach of the Client's internal system which provisions and/or stores the Participants credentials to access the Covered Services through the FSSO. To the extent permitted by applicable law, Client shall keep appropriate access logs for at least six months from each access and provide any such relevant extracts of log data to ADP in the event of a security incident. Furthermore, Client shall generally cooperate with ADP in addressing any security breaches and or emergencies as reasonably requested by ADP.

3.4. **Transition.** In the event of termination of the FSSO for cause by ADP, ADP will use reasonable efforts, in cooperation with Client, to convert the provision of the then continuing Covered Services to ADP's standard security authentication systems, but ADP will not be responsible for any consequences or damages to Client resulting from unavailability of the Covered Services to Client or Participants while such reasonable efforts are being made by ADP.

**ADP Wage Payment Services: ALINE Traditional**

Client desires to receive and ADP agrees to provide the following Services to Client in addition to those already provided under the Agreement.

1. **Definitions**. Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed that term in the Agreement.

    1.1. **"ADPCheck"** means checks printed and distributed by ADP to Payees pursuant to Client's direction.

    1.2. **"ADPCheck Services"** refers to ADP's payment of Client's Payees for Permitted Payments through ADPCheck.

    1.3. **"ADP Direct Deposit Services"** means ADP's full service direct deposit services which includes ADP's payment of Client's Payees who have elected to receive Permitted Payments by direct deposit into an account at a financial institution of such Payee's selection.

    1.4. **"ALINE Card"** means the pre-paid card issued to Client's Payees for Permitted Payments.

    1.5. **"ALINE Card Services"** refers to ADP's payment of Client's Payees through an ALINE Card issued by the Issuing Bank.

    1.6. **"ALINE Cardholder"** means the Payees of Client who receives an ALINE Card.

    1.7. **"Identity Verification Documents"** means the documents that meet the federal requirements for verifying a Payee's identity and eligibility to work in the U.S. (e.g., (i) a passport, (ii) a U.S. issued driver's license or picture identification card issued by a state or U.S. federal agency and social security card, or (iii) a U.S. issued driver's license and birth certificate).

    1.8. **"Issuing Bank"** means the financial institution selected by ADP that issues the ALINE Card.

    1.9. **"NACHA"** means the National Automated Clearing House Association.

    1.10. **"Payee"** means any intended recipient of payments under the Payment Services and may include Client's employees, taxing authorities, governmental agencies, suppliers, benefit carriers and/or other third parties; provided that in the case of ADP Wage Payment Services, Payee shall be limited to Client's employees and independent contractors.

    1.11. **"Permitted Payment"** means the legal payment of wages, commissions, consulting fees or similar compensation or work-related expenses in the employment context.

    1.12. **"Regulation E"** means the Federal Reserve Board, Regulation E (12 CFR 1005).

2. **Service Summaries.**

    2.1. **ADP Wage Payment Services.** Payment of wages, commissions, consulting fees or similar compensation or work-related expenses in the employment context to employees and independent contractors via direct deposit, check, or payroll debit cards, in each case

to the extent the method of payment delivery is in scope, and online posting of pay statements. Such services may be provided via ADPCheck Services, ADP Direct Deposit Services and ALINE Card Services.

3. **Additional Terms.** The following additional terms and conditions apply to the ADP Wage Payment Services:

3.1. **ADPCheck Services.** Client agrees not to distribute any ADPChecks to Payees in a manner that would allow Payees to access the associated funds before pay date. With respect to ADPChecks drawn on an ADP bank account, to request a stop payment, Client shall provide ADP with a written stop payment order request in the form provided by ADP and ADP shall place a stop payment order in accordance with its standard operating procedures.

3.2. **ALINE Card Services.** To the extent received, Client will be responsible for securing all welcome kits to prevent unauthorized access or use.

3.2.1. **ALINE Cardholder Set-Up.** Client will set-up (or cause ADP to set-up) each Payee as a ALINE Cardholder using data and procedures required by the Issuing Bank or ADP. Client shall obtain all necessary consents of each Payee included in submitted set-up data that is required under applicable law and rules, including NACHA, for Payee to (i) receive payments from Client on its ALINE Card and (ii) participate in the ALINE Card Services, and Client is responsible for reviewing and confirming that all enrollment information supplied to ADP is accurate and complete.

Prior to set-up of any Payee on the ALINE Cardholder database and distribution of an ALINE Card to the Payee, Client will verify the Identity Verification Documents. Client shall obtain from the Payee and provide to ADP the following information: (a) name; (b) residential address (a P.O. Box is not acceptable); (c) date of birth; (d) social security number; and (e) personal telephone number. Client agrees to provide any additional information as may be required by ADP or the Issuing Bank. Client will not provide ALINE Card to individuals outside the United States without the express written consent of ADP. Client further agrees that ADP or Issuing Bank (directly or through a subcontractor) may seek identity information and legal documentation directly from the Payee to verify the identity of any Payee and that a Payee may be denied ALINE Card Services for several reasons, including failure to validate the personal information of the Payee. For each ALINE Cardholder, Client will make and preserve either of the following: (1) a copy of the Identity Verification Documents; or (2) a description of the Identity Verification Documents, noting the date reviewed, type of document, and if applicable, the document's identification number, place of issuance and issuance and expiration date, provided Client will preserve a copy of all Identity Verification Documents for Payees who are form 1099 independent contractors. Client shall retain such documentation during the time that such Payee is a ALINE Cardholder until the earlier of (x) five years from termination of Client's obligation to make payments to such Payee or (y) five years from termination of such Payee's ALINE Card account; provided, however, that in the event a longer retention period is required for the Issuing Bank or ADP to meet its legal obligations, as a result of a change in applicable law or official interpretations thereof, ADP shall provide notice of such longer retention period and Client shall retain such documentation for such longer retention period.

3.2.2. **Enrolling Employees for Cards.** Prior to providing Payee's information to ADP to issue a permanent ALINE Card or Client enrolling a Payee for an instant issue ALINE Card, Client shall provide each Payee with the notice required under the USA Patriot Act which reads as follows: "**IMPORTANT INFORMATION ABOUT PROCEDURES**

<u>FOR OPENING A NEW PREPAID CARD ACCOUNT.</u>  To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  What this means for you: When you open a prepaid card account, we may require your name, address, date of birth, social security number, tax identification number and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents."  The USA Patriot Act notice may be updated from time to time by ADP or the Issuing Bank.

Prior to or in conjunction with distributing an ALINE Card to any Payee, Client shall remove the account routing information from the card kit.  Client shall not, disclose or make available the account routing (ABA/DDA) number to any Payee and shall always direct Payees to the ALINE Cardholder services telephone number to obtain such account routing (ABA/DDA) number.  Payees must accept the ALINE Cardholder Terms and Conditions, and the ALINE Card may be cancelled by ADP or the Issuing Bank at any time in accordance with the ALINE Cardholder Terms and Conditions.  Client will provide ALINE Cardholders with any other information and materials regarding the ALINE Card Services provided to it from time to time as determined by ADP.  The amounts to be loaded to each ALINE Cardholder's ALINE Card will be provided to ADP by Client through one of ADP's standard payroll transmission methods available to Client or another means agreed to by ADP and Client.

3.2.3. **ALINE Card Status, Services and Communications.**   Client is responsible for ensuring that ALINE Cardholders are paid via an alternate pay method in such instances where a ALINE Cardholder's ALINE Card has not been activated, has terminated, cancelled or is in inactive status and even if a Payee has consented to receive their Permitted Payments by the ALINE Card.  Client will direct ALINE Cardholders to ADP's ALINE Cardholder services with respect to any Card inquiries, to resolve all disputes regarding ALINE Card and to report any lost or stolen ALINE Cards, provided Client will resolve disputes by ALINE Cardholders regarding amounts credited or debited to the ALINE Cards at the request of Client (e.g., credits as a result of payroll).  Client understands that it is not entitled to access or review any ALINE Cardholder transaction information and that it has no right to draw back any amounts funded to the ALINE Card other than due to an error.  Notwithstanding the foregoing, in limited circumstances (e.g., where necessary to investigate or prevent fraud) and consistent with the applicable ALINE Cardholder privacy notice, ADP may provide certain ALINE Cardholder transaction information to Client.  ALINE Cardholders may receive notices, mailings and other communications related to the Card and Card features (e.g., secondary cards, card portability, reward programs, etc.) from or on behalf of ADP or the Issuing Bank.

3.2.4. **Issuing Bank.**  All ALINE Cards issued to ALINE Cardholders are the property of the Issuing Bank and are subject to cancellation by the Issuing Bank at any time in accordance with the Issuing Bank's ALINE Cardholder Terms and Conditions. The ALINE Card Services may be modified as required by the Issuing Bank and as ADP may deem appropriate to assist ADP or the Issuing Bank in complying with its obligations, including legal and regulatory obligations.

3.2.5. **ALINE Cardholder Fees.** Client acknowledges that separate fees as set forth on the fee schedule provided in the card kit prior to activation of the ALINE Card will be applied to the ALINE Card and are the responsibility of the ALINE Cardholder.  Such ALINE Cardholder fees are subject to change in accordance with the ALINE Cardholder Terms and Conditions applicable to the ALINE Cards.

3.2.6. **Information Requests.** Client agrees that upon prior notice from ADP or the Issuing Bank, ADP, the Issuing Bank and any regulatory authorities with jurisdiction over the Issuing Bank or ADP shall have the right to inspect Client's books and records related to Client's use of the ALINE Card Services and Client's performance of its obligations with respect thereto.

3.2.7. **Third Party Beneficiary.** Notwithstanding anything to the contrary in Annex A, Client agrees that the Issuing Bank (and its respective successors and assigns) is a third party beneficiary of this Agreement, but solely as it relates to the ALINE Card Services, and is entitled to enforce each of the applicable provisions Client as well as the limit on liability provisions of Section 7 of Annex A of Annex A, including in equity and in law, as if it or they were a party hereto.

3.2.8. **Compliance.** Notwithstanding anything to the contrary in Section 2.3 of Annex A, ADP shall be responsible for compliance with requirements of Regulation E applicable to financial institutions with respect to payroll card accounts, provided Client will fulfill the compliance responsibilities of Regulation E that Client controls, including: (a) Client will distribute to its Payees all documentation (including without limitation, ALINE Card fee schedule and ALINE Cardholder Terms and Conditions) that ADP makes available to Client for distribution purposes, and (b) Client will not mandate or unduly influence that any Payee receive Permitted Payments only on the ALINE Card; in lieu of such mandate, Client will provide to Payees other legally permissible options for payment of Permitted Payments. Client agrees that it will not rely solely on its use of the ALINE Card Services in complying with any laws and governmental regulations and that it will comply with the financial industry rules and compliance standards imposed by various card/payment networks or associations (e.g., related to such things as card security and fraudulent or impermissible use of ALINE Cards).

3.2.9. **Additional Termination Provisions for ALINE Card Services.** In addition to any other terms and conditions of the Agreement, ADP may terminate the ALINE Card Services as follows: (i) the ALINE Card Services (or any feature thereof) in any designated jurisdiction may be terminated on 60 days' notice to Client if ADP or the Issuing Bank believes that any changes in any Network Rules or NACHA rules, or changes to, or interpretations of, applicable law by any federal, state or local governmental authority, or any formal or informal order, instruction or directive communicated to ADP or the Issuing Bank by such authority make it commercially impractical to continue to provide the ALINE Card Services (or any feature thereof) in such jurisdiction; or (ii) the Issuing Bank cancels the ALINE Cards issued on behalf of Client (e.g., due to Client's non-compliance with its obligations) or advises ADP that it is no longer willing to service the ALINE Card, provided that in such later instance ADP shall take commercially reasonable steps to engage a successor Issuing Bank, and provided further that ADP shall not be liable for any delay in providing the ALINE Card Services during such search for a successor Issuing Bank.

**ADP Wage Garnishment Payment Services**

Client desires to receive and ADP agrees to provide the ADP Wage Garnishment Payment Services to Client in addition to those already provided under the Agreement.

1. **Definitions.** Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed to that term in the Agreement.

   1.1. **"ADPCheck"** means checks printed and distributed by ADP to Payees pursuant to Client's direction.
   1.2. **"Payee"** means any intended recipient of payments under the Payment Services and may include Client's employees, taxing authorities, governmental agencies, suppliers, benefit carriers and/or other third parties; provided that in the case of ADP Wage Payment Services, Payee shall be limited to Client's employees and independent contractors.

   1.3. **"Payment Services"** means Services that involve electronic or check payments being made by ADP to third parties on Client's behalf and at its direction.

2. **Service Summary.**

   2.1. **Wage Garnishment Payment Services.** Garnishment payment processing and disbursement of payments to appropriate payees as directed by client.

3. **Additional Terms.** The following additional terms and conditions apply to the ADP Wage Garnishment Payment Services:

   3.1. **Description of Services.** ADP will act solely in the capacity of a third party service provider of payment processing.

   3.2. **Client's Use of Services.** Client agrees not to distribute any ADPChecks to Payees in a manner that would allow Payees to access the associated funds before pay date.

   3.3. **Payment Services.** The following Payment Services terms apply to the ADP Wage Garnishment Payment Services.

      3.3.1. **Suspension.** Without limiting the foregoing, the parties agree that Payment Services involve credit risk to ADP. Payment Services may be suspended by ADP **(A)** immediately following notice to Client (i) that Client has failed to remit sufficient, good and available funds within the deadline and via the method of delivery set forth in Pricing Appendix-1 as it relates to the applicable Payment Services, or (ii) if Client breaches any rules promulgated by the National Automated Clearing House Association as it relates to ADP conducting ACH transactions on behalf of Client, and **(B)** with 24 hour notice if: (i) a bank notifies ADP that it is no longer willing to originate debits from Client's account(s) or credits for Client's behalf for any reason or (ii) the authorization to debit Client's account is terminated or ADP reasonably believes that there is or has been fraudulent activity on the account. If the Payment Services are terminated or suspended pursuant to Section 8.4 of Annex A or this Section, Client acknowledges that ADP shall be entitled to allocate any funds in ADP's possession that have been previously remitted or otherwise made available by Client to ADP relative to the Payment Services in such priorities as ADP may determine appropriate, including reimbursing ADP for payments made by ADP on Client's behalf to a third party. If the Payment Services are terminated by ADP, Client understands that it will (x) immediately become solely responsible for all of Client's third party payment obligations covered by the

Payment Services then or thereafter due, and (y) reimburse ADP for all payments properly made by ADP on behalf of Client to any payee, which has not been paid or reimbursed by Client.  If the Payment Services remains suspended for 30 days, the affected Payment Service shall be deemed terminated on the 31st day following suspension.

3.3.2. **Client Credentialing.**  Client understands and acknowledges that the implementation and ongoing provision of Payment Services are conditioned upon Client passing (and continuing to pass) a credentialing process that ADP may deem necessary in connection with the provision of Payment Services.

3.3.3. **Additional Requirements.**  Payment Services may be subject to the rules and standards of any applicable clearing house, payment and/or card networks or associations. Client and ADP each agree to comply with all such rules and standards applicable to it with respect to the Payment Services.

3.3.4. **Funding Obligations.**  Client acknowledges that ADP is not a lender.  As such, as a condition to receiving services, Client will remit or otherwise make available to ADP sufficient, good and available funds within the agreed-to deadline and via the agreed-to method of delivery to satisfy all of Client's third-party payment obligations covered by the Agreement. ADP will apply such funds to satisfy such third-party payment obligations.  ADP will not be required to provide Payment Services if ADP has not received all funds required to satisfy Client's third-party payment obligations.  Client will immediately notify ADP if it knows or should know that it will not have sufficient funds to satisfy the amounts required in connection with the Payment Services. If Client has a material adverse change in its condition, ADP may modify the funding method or deadline by which funds must be made available to ADP for payment to Payees.  Client agrees to pay to ADP upon demand any amounts that have been paid by ADP to satisfy Client's third party payment obligations prior to receiving such amounts from Client.

3.3.5. **Investment Proceeds; Commingling of Client Funds.** IF ADP RECEIVES CLIENT'S FUNDS IN ADVANCE OF THE TIME ADP IS REQUIRED TO PAY SUCH FUNDS TO THIRD PARTIES, ALL AMOUNTS EARNED ON SUCH FUNDS, IF ANY, WHILE HELD BY ADP WILL BE FOR THE SOLE ACCOUNT OF ADP. ADP may commingle Client's funds with similar funds from other clients and with similar ADP and ADP-administered funds.  ADP utilizes a funds control system that maintains general ledger entries by client and/or by jurisdiction.

3.3.6. **Recovery of Funds; Stop Payment Requests.** Client agrees to cooperate with ADP and any other third parties to recover funds erroneously issued or transferred to any Payee or credited to any Payee's account. If Client desires to stop payment on any check or to recall or reverse any electronic payment, Client will provide ADP with a stop payment request in the form required by ADP.  Client acknowledges that ADP's placement of a stop order request is not a guarantee that such stop payment will occur.

**PRICING APPENDIX-1**
CLIENT: BELCAN LLC

### SECTION 1     CLIENT GROUP.

If applicable, the Client Group includes the following entities:

Belcan LLC
10200 Anderson Way
Blue Ash, OH 45242

### SECTION 2     ADDRESS OF ADP FOR NOTICES.

ADP, LLC
5800 Windward Parkway
Alpharetta, GA 30005

### SECTION 3     TERMINATION DATE.

In the case of Services provided in the United States, the Termination Date is 3 years from the date on which live processing commences for ADP Vantage HCM Services hereunder.

### SECTION 4     FEE EFFECTIVENESS; FEE CHANGES.

The Implementation Services fees (if any) set forth in this Pricing Appendix-1 will be effective as of the date ADP begins providing Implementation Services. The ongoing Services fees set forth in this Pricing Appendix-1 will become effective on the latter of (a) the date of execution of this First Amendment by ADP, if ADP is the last party to sign or (b) the date of receipt of a fully executed First Amendment by ADP, if ADP is the first party to sign (such date being the "**Ongoing Services Pricing Effective Date**"); for any ongoing Services provided to Client prior to the Ongoing Services Pricing Effective Date, Client will pay the rates invoiced to Client by ADP for such Services.

The fees set forth in this Pricing Appendix-1 will remain fixed during the first year following the First Amendment Effective Date. During the remainder of the Initial Term, ADP may increase the fees for the Services on an annual basis by 2.5% with 30 days' prior written notice. After the Initial Term, ADP may modify the fees upon 30 days' prior written notice to Client.

The fees set forth in Section 5.3 may be modified by ADP upon written notice to Client (if and as applicable).

In the case of Services provided in the United States, unless Client provides ADP a valid tax exemption or direct pay certificate, Client will pay directly, or will pay to ADP, an amount equal to all applicable taxes or similar fees levied or based on this Agreement or the Services, exclusive of taxes based on ADP's net income.

**Changes in Scope.** The fees in the Pricing Appendix may be revised by mutual agreement (not to be unreasonably withheld) if Client's actual requirements, specifications, volumes or quantities vary materially from those communicated to ADP as of the Effective Date of this Agreement (e.g., a material change in the number of pays or the pay frequency).

### SECTION 5     FEES.

**5.1    Implementation Fees.**
**5.1.1    Implementation Services Fees.**
The "**One-Time Implementation Fees**" sets forth the fee structure for Implementation Services.

**One-Time Implementation Fees**

Implementation Fees:     $108,780.48

**Includes:**

  ADP Marketplace

ADP Payroll Services

  **ADP Wage Payment Services**

  **ADP Print and Online Statement Services**

PROPRIETARY AND CONFIDENTIAL TO ADP



**PRICING APPENDIX-1**
CLIENT: BELCAN LLC

ADP Wage Garnishment Payment Services

ADP Employment Tax Services

<u>Application/Hosting Services</u>

Hosting Facility & Services

<u>General Services</u>
Federated Single Sign On

*- Pricing does not include travel and related expenses, any such expenses will be billed as incurred.*

*– Data will include all Client employee and company level data (current row and applicable historical rows) for included ADP Vantage HCM components. Client must provide to ADP a data dictionary, which defines the structure of the database itself (not that of the data held in the database) and is used in control and maintenance of large databases and records, including, among other items of information, (1) what data is stored, (2) the name, description, and characteristics of each data element, (3) the types of relationships between data elements, and (4) access rights and frequency of access, in order to know what the table structure is for the data to enable ADP to readily understand the data provided. An entity relationship diagram ("ERD"), which is a graphical notational representation of the relationships between entities in a relational database or information system that consists mainly of entities, attributes, relationships, cardinalities and ordinalities, is also an acceptable manner for Client to convey such data structure information to ADP. Client must provide to ADP all Client source data; ADP must be able to successfully view it to ensure it is readable, decrypted and not corrupted, and Client must ensure such data includes expected data types (e.g., personal, job, employment) prior to the start of the Implementation (Week 1 in the implementation plan). In the event Client fails to provide source data prior to the commencement of the implementation (Week 1 in the implementation plan), then Client will pay all reasonable and actual costs incurred by ADP related to the failure in accordance with ADP's change control process.*

**Training**

- ADP's schedule of standard and public training classes is available upon request and at http://ilearn.adp.com.
- Standard training materials may include but are not limited to one or more of the following; in person or virtual instructor led training, e-learning, pre-recorded courses, help documentation, reference guides, pre-recorded task demonstrations, and job aides. Specific materials vary by product and service.
- All standard e-learning, pre-recorded courses, help documentation, reference guides, pre-recorded task demonstrations, and job aides are available at no additional cost.
- All other in-person and or virtual instructor led training is offered at ADP's current rates.
- Client is responsible for all travel expenses associated with training.

**5.2 Ongoing Services Fee.**
The fees for ongoing Services (the "**Ongoing Services Fees**") are set forth in the table below. The ongoing Services fees billed on a monthly basis shall commence effective on the first day of the month in which the environment is made available to Client for transaction processing. Client understands that the ongoing Services fees will be invoiced whether or not all components of the Services have gone live.

| Ongoing Services Fees | 7,258 employees |
|---|---|
| Except as noted below in Section 5.3, includes the items set forth above in Section 5.1 | $4.24 PEPM * |

*- ADP will continue to charge Client at the current rates for any components of Services that are itemized in Client's previous pricing appendix that are not specifically listed in this appendix-1.*

**Volume Matrix**

The following matrix shall apply to the Ongoing Service Fees set forth in this Pricing Appendix-1, and only during the Initial Term of this Agreement.

On each anniversary date of Vantage go live, Client and ADP shall compare to the Client's paid employee per month for the previous 12 months (Current Employee Paid Per Month) with the Employee Paid Per Month Annual Baseline*.

If the Employee Paid Per Month Annual Baseline* and the Current Employee Paid Per Month varies according to the matrix below, the Client's then current Vantage Services PEPM fee will be adjusted in accordance with such schedule. In the event of any such adjustments, the Vantage Services PEPM fee will be rounded to the nearest two decimal places. Upon the conclusion of all such annual reviews, the PEPM Annual Baseline and the Employee Paid Per Month Baseline shall become equal to the

PROPRIETARY AND CONFIDENTIAL TO ADP



**PRICING APPENDIX-1**
CLIENT: BELCAN LLC

revised PEPM and revised Employee Paid Per Month Baseline used in that annual review.

*Client's initial annual paid Employee Paid Per Month Baseline for 284,374 annual pay volume at the Vantage go live date is $4.24.

| Change in Annual Pay Volume (Calculated each Anniversary of Go Live) | Change in PEPM (Baseline is $4.24 PEPM) |
|---|---|
| Reduction > 50% | Price Increase as defined in Section 4 + 3% |
| Reduction between 7.501% - 50.0% | Price Increase as defined in Section 4 + 2% |
| Reduction between 0.01% - 7.5% | Price Increase as defined in Section 4 |
| Increase between 0% - 7.5% | Price Increase as defined in Section 4 |
| Increase between 7.501% - 15.0% | Waive Price Increase |
| Increase between 15.01% - 50% | Waive Price Increase plus 2% Reduction in Fee |
| Increase > 50% | Waive Price Increase plus 3% Reduction in Fee |

If applicable, items not included in the PEPM are stated below:

| Ongoing Services Fees | Units | Rate per Unit | Frequency | Monthly Cost | Estimated Annual Cost | Based on |
|---|---|---|---|---|---|---|
| Deferred Implementation Fees | | | | $3,021.68 | $36,260.16 | - Subject to credit approval<br>- Billable upon service commencement |
| **Payroll Services** | | | | | | |
| W-2s | 10,306 | $2.30 | per W-2 | | $23,703.80 | |

With respect to Self Service:

"**Client Content**" means all information and materials provided by Client, its agents or employees, regardless of form. Client will timely provide the Client Content necessary for ADP to provide the Services in the format requested by ADP, and will otherwise provide all reasonable assistance required of Client in order for ADP to successfully implement the Services. Client is responsible for the accuracy and completeness of the Client Content provided to ADP. Except for the rights expressly granted to ADP in this Agreement, all rights, title and interests in and to Client Content, including all Intellectual Property Rights inherent therein and pertaining thereto, are owned exclusively by Client or its licensors. Client hereby grants to ADP for the Term a non-exclusive, worldwide, non-transferable, royalty-free license to use, edit, modify, adapt, translate, exhibit, publish, reproduce, copy and display the Client Content for the sole purpose of performing the Services; provided Client has the right to pre-approve the use by ADP of any Client trademarks or service marks.

**5.2.1    Reserved.**

**5.2.2    Reserved.**

**5.3    Miscellaneous Rate Card Items (if applicable).**
**5.3.1**    The fees for Miscellaneous Services (the "**Miscellaneous Services Fees**") are set forth in the table below. The Miscellaneous Services Fees are based on the scope of work and will be charged at the applicable rates as they occur or as the Estimated Volume included in fees set forth below is exceeded after the Services commence.

PROPRIETARY AND CONFIDENTIAL TO ADP



**PRICING APPENDIX-1**
CLIENT: BELCAN LLC

| Category | Item Description | Units Included in Fees | Rate per Unit (or ADP Prevailing Rate) | Frequency | Based on |
|----------|------------------|------------------------|----------------------------------------|-----------|----------|
| **Hosting Services** | | | | | |
| Hosting | Additional Client Requested Databases - Temporary or Permanent | 0 | $4,000.00 | Monthly | - Per database per month (excluding the one (1) production and one (1) testing instance included in base hosting fee) |
| **ADP Payroll Services** | | | | | |
| Pays/Distribution | Adjustment Payrolls | 0 | $100.00 | Per processing | - $100 per processing |
| | ADPCheck Early Check Cashing Fee | 0 | $35.00 | Per transaction | |
| | Stop Payments, Void, Cancelled Check or Direct Deposits | 0 | $12.00 | Per occurrence | |
| **Year End Services** | | | | | |
| Year End Services | W-2 Reissue | 0 | $8.50 | Per form | - Minimum $500.00 annual maintenance |
| **ADP Employment Tax Services** | | | | | |
| State/Local Fees | Tax Jurisdictions in Applied For Status | 0 | $50.00 | Per occurrence | - Per state per month |
| | Tax Registration Services | 0 | $100.00 | Per transaction | - First occurrence is billed at $150.00 |
| Amendments | Amended Return | 0 | $105.00 | Per occurrence | - Applies to all Federal, State, Local, SIT, SUI returns - prepared by Client |
| SSN Changes | Social Security Number Change | 0 | $55.00 | Per occurrence | - Applies to SUI, State Recon, Local Recon |
| Exceptions | Exception Return | 0 | $150.00 | | Applies to:<br>- Federal 941, 942, 944, 945, 1086, W-3C<br>- FUTA, SIT and SUI<br>- CA<br>- NJ SIT/SUI<br>- State Recon and State 1096<br>- Local, Local Recon and Local 1096 |
| | Re-close Fee | 0 | $50.00 | Per occurrence | |

**5.4    Postage, Shipping, Travel and other Out-of-Pocket Expenses.**  ADP will invoice Client for postage charges, delivery charges, other third party charges incurred on behalf of Client, and reasonable travel and out-of-pocket expenses.  Travel and Expenses shall be previously approved in writing by Client.

**5.5    Change Control Fees.**  In the event either party requests a change in the scope of the Services (including Implementation Services) (each a "Change Control Item"), the parties shall address such change request via ADP's change control process.  Change Control Items and the cost associated with such changes (if any) to the Services shall be mutually agreed to by the parties, with the exception of Change Control Items that are required to be made by law or regulation applicable to the Services or to the duration of Implementation Services, which ADP will notify Client of prior to making such change.

PROPRIETARY AND CONFIDENTIAL TO ADP

E-FILED 11/07/2023 9:40 AM  /  CONFIRMATION 1391480  /  A 2304792  /  COMMON PLEAS DIVISION  /  IFIJ



**PRICING APPENDIX-1**
CLIENT: BELCAN LLC

The standard rate for a Change Control Item is $185.00 per hour; provided, however, that such rate may be increased by ADP as follows:

- By 50% for Change Control Items requested by Client after October 1st which ADP agrees to deliver by January 31st;

- By 25% if, after receiving a Change Control Notice, the Client requests an expedited timeframe for completion of the Change Control Item.

**5.6    Funding Requirements.**  Client must be setup with a permanent reverse wire collection method for processing of garnishment, tax liabilities, and/or ADP Wage Payment Services impounds.  Tax liabilities and garnishment impounds will be collected one (1) Business Day prior to pay date.  ADP Wage Payment Services, including FSDD will be collected two (2) Business Days prior to pay date.

**5.7    Deferred Implementation Fees.**
A.       Client acknowledges that a portion of the setup and one-time costs for the Implementation Services have been deferred (the "**Deferred Fee**") and will be paid by Client as part of the processing fees over the Initial Term of this Agreement (which is 36 months from the date of first live processing hereunder) ("**Deferred Period**"), with payments being calculated on a monthly basis with each monthly payment in the amount of $3,021.68 (the "**Deferred Fee Monthly Amount**").

If this Agreement expires or is terminated by either ADP or Client for any reason whatsoever prior to the expiration of the Deferred Period, Client will pay to ADP an amount equal to the sum of (i) the Deferred Monthly Fee Amount, multiplied by the number of months remaining in the Deferred Period as of the effective date of termination, plus (ii) any outstanding Deferred Fee Monthly Amounts which are owed by Client for any months preceding the effective date of termination.

B.       Notwithstanding anything in the Agreement to the contrary, Client agrees that ADP may assign, sell, transfer, pledge or otherwise dispose of its rights (but none of the related obligations) under the Agreement to receive payment for Client's obligation (or portion thereof) to pay the Deferred Fee, without notice or consent of Client, to one or more assignees, and any assignee may further freely assign the same.

**SECTION 6    APPLICATION PROGRAMS.**

The Application Programs licensed to Client are listed below:

ADP to deploy the Application Programs at a Uniform Resource Locator (URL) to be selected, registered, and owned by ADP.

- **ADP Vantage HCM**
- **ADP Reporting**
    ADP reserves the right to substitute different technology, so long as no substitution has a material adverse effect on System performance or ADP's ability to meet the Service Levels, and ADP will discuss same with Client.

**SECTION 7    EXHIBITS.**

Exhibit 1 –  Volume Assumptions
Exhibit 2 –  Interfaces
Exhibit 3 –  Service Commitments

PROPRIETARY AND CONFIDENTIAL TO ADP



**EXHIBIT 1 – VOLUME ASSUMPTIONS**
CLIENT: BELCAN LLC

## Volume Assumptions

The following table includes the additional assumptions with respect to estimated volumes for each category of Services indicated below. Pursuant to the Ongoing Services Fees are based on the assumptions below. If Client's actual requirements vary from what is stated, the parties shall negotiate in good faith to adjust the fees based on such changes. The fees do not include any customizations to any Service.

| Category | Item Description | Units Included in Fees | Rate per Unit (or ADP Prevailing Rate) | Based on |
|---|---|---|---|---|
| **Implementation Services** | | | | |
| Data Conversion | Data Conversion Sources | 1 | Included | - Electronic files will be provided to ADP based on ADP's required file formats and mapping legends<br>- ADP will complete conversion of employee level indicative data and QTD and YTD accumulator balances (if applicable) for testing and Go Live<br>- Client will be required to complete dual maintenance after final conversion through Go Live |
| | Payroll Data Mapping | 2 | Included | - Mapping support will be provided by ADP |
| | Employee Job and Check History | 5 | Included | - Based on 5 years and one source for each type of history<br>- History conversion must be part of the initial configuration<br>- Conversion of additional years beyond 3 or as Phase II will incur additional charges |
| | Tax Conversion Sources | 1 | Included | - Tax conversion included for current year |
| System Configuration | Payroll | Included | Included | - Assumes defined pay practices, no significant changes during implementation of pay practices and policies |
| | Payroll - Development of TLM and Other Paydata Files | Not Included | Not Included | - Client (or Client's vendor) is responsible for developing any External Paydata Input (EPIP) file(s), in ADP's format, for any time and labor data collection for non-ADP systems (e.g., hours and earnings from third party source) |
| Validation | Testing - Test Files | 2 | Included | - Client will perform testing based on the standard ADP methodology<br>- Tests assume end-to-end testing of entire populations, processes and interfaces<br>- Client will be responsible for data integrity and will perform data cleansing prior to each conversion with a final signoff procedure before Go Live |
| General Ledger | GL Charts of Account | 1 | Included | |
| **ADP Payroll Services** | | | | |
| Populations | Annual Checks | 284,374 | Included | - Includes up to 284,374 annual checks |

E-FILED 11/07/2023 9:40 AM / CONFIRMATION 1391480 / A 2304792 / COMMON PLEAS DIVISION / IFIJ

E-FILED 11/07/2023 9:40 AM / CONFIRMATION 1391480 / A 2304792 / COMMON PLEAS DIVISION / IFIJ



**EXHIBIT 1 – VOLUME ASSUMPTIONS**
CLIENT: BELCAN LLC

| Category | Item Description | Units Included in Fees | Rate per Unit (or ADP Prevailing Rate) | Based on |
|---|---|---|---|---|
| | Pay Frequencies | 2 | Included | - Includes up to 2 pay frequency(ies) |
| | Employees Paid Weekly | 3,465 | Included | - Processing for up to 3,465 employees paid weekly included |
| | Employees Paid Bi-Weekly | 3,793 | Included | - Processing for up to 3,793 employees paid bi-weekly included |
| | Employees Paid Semi-Monthly | 0 | Included | - Processing for up to 0 employees paid semi-monthly included |
| | Employees Paid Monthly | 0 | Included | - Processing for up to 0 employees paid monthly included |
| Client Practitioners | Client Named Contacts | 5 | Included | - Includes up to 5 Client Named Contacts who may contact the ADP Support Team |
| Pays/ Distribution | Off-cycle Checks | 5,576 | Included | - Includes up to 5,576 off-cycle checks annually |
| Garnishments | Payments | 14,219 | Included | - Includes up to 14,219 payments annually |
| Reporting | CD ROM Output for Reports | 1 | Included | - Includes 1 CD(s) |



**EXHIBIT 2 – INTERFACES**
CLIENT: BELCAN LLC

| Description | Type | Source System | Destination System | Freq | Assumptions |
|---|---|---|---|---|---|
| Vantage Data Bridge (UVI) New Data Bridge | Inbound | Oracle | Vantage | TBD | Inbound of Oracle foundation tables |
| Vantage Data Bridge (UVI) ERP Connection Comprehensive | Inbound | Oracle | Vantage | TBD | Inbound of Oracle HR system of record to include employee changes, demographics and new hires |
| Vantage Data Bridge (UVI) New Data Bridge | Inbound | Merrill Lynch | Vantage | TBD | Inbound of 401K elections and loan information from Merrill Lynch |
| Vantage Data Bridge (UVI) New Data Bridge | Inbound | Bswift | Vantage | TBD | Inbound of Benefit related deductions |
| Vantage Data Bridge (UVI) New Data Bridge | Inbound | Bswift | Vantage | TBD | Inbound of memo codes information to denote employer contributions of Benefits for W2 purposes |
| Client Software Development - Backend Simple/Average | Outbound | Autopay | Merril Lynch | TBD | Outbound of 401K information to Merrill Lynch |
| Client Software Development - Backend Complex/Very Complex | TBD | Autopay | TBD | TBD | Optional - Worker's Compensation reporting |
| Client Software Development - Backend Complex/Very Complex | TBD | Autopay | TBD | TBD | Optional - Multiworksite reporting |
| Fidelity Loan | Inbound | Fidelity | Vantage | TBD | |
| Fidelity Contribution | Inbound | Fidelity | Vantage | TBD | |
| Fidelity Demographic | Outbound | Vantage | Fidelity | TBD | |
| Fidelity Contribution | Outbound | Vantage | Fidelity | TBD | |
| Correll Loan | Inbound | Correll | Vantage | TBD | |
| Correll Contribution | Inbound | Correll | Vantage | TBD | |
| Correll Demographic | Outbound | Vantage | Correll | TBD | |
| Correll Contribution | Outbound | Vantage | Correll | TBD | |
| Wage Works | Inbound | Wage Works | Vantage | TBD | |
| Wage Works | Outbound | Vantage | Wage Works | TBD | |
| FSA Chard | Inbound | Chard | Vantage | TBD | |
| FSA Chard | Outbound | Vantage | Chard | TBD | |
| Equifax | Outbound | Autopay | Equifax | TBD | |

ADP Proprietary and Confidential



**Exhibit 3**

# Service Commitments

PROPRIETARY AND CONFIDENTIAL TO ADP, LLC

E-FILED 11/07/2023 9:40 AM / CONFIRMATION 1391480 / A 2304792 / COMMON PLEAS DIVISION / IFJ



1. **Definitions**. Unless defined herein, the defined terms used shall have the same meaning ascribed such terms in the Agreement.

    1.1 "**Allocation Percentage**" means the weighting factor, expressed as a percentage between 0% - 50%, assigned to each Service Level as specified in Attachment A hereto.

    1.2 "**At Risk Amount**" means five percent (5%) of the fees for the applicable Service performed during the applicable Measurement Period.

    1.3 "**Go-Live Date**" shall have the meaning set forth in the Global Master Terms and Conditions.

    1.4 "**Key Performance Indicator**" means an objective level of quality, reliability, timeliness or other performance standard for an aspect of the Services, as described in Attachment A hereto, to which no Service Level Credit applies, but which is meaningful to Client's business.

    1.5 "**Measurement Period**" means the frequency by which a Service Commitment is measured. The Measurement Period for each Service Commitment is specified in Attachment A hereto.

    1.6 "**Service Commitments**" means Service Levels and, where applicable, Key Performance Indicators, collectively.

    1.7 "**Service Level Commencement Date**" means the first day of the month that immediately follows the expiration of the ninety (90) day period commencing on the Go-Live Date for the applicable Service.

    1.8 "**Service Level Credit**" shall have the meaning set forth in Section 5.1.

    1.9 "**Service Level Failure**" means, with respect to a given Service Level, ADP's failure to perform the Services at a level that meets that Service Level.

    1.10 "**Service Level**" means an objective level of quality, reliability, timeliness or other performance standard for an aspect of the Services, as described in Exhibit 2 to Attachment A hereto, to which a Service Level Credit applies.

2. **General**. Subject to the terms of this Exhibit 3, ADP will perform the Service in a manner consistent with the applicable Service Commitments.

3. **Reporting**. Within twenty (20) days after the end of each month during the Term, ADP will provide Client with a report detailing ADP's performance of the Services during the preceding month and the two (2) months prior to such month. For example, no later than April 20th, ADP will provide Client a report for the months of January, February, and March.

4. **Excused Performance**. ADP will not be responsible for any Service Level Failure due to: (i) failures by Client, its Affiliates or their respective representatives, vendors, subcontractors or agents to provide ADP at least thirty (30) days prior written notification of changes in Client's administrative policies and/or procedures, to the extent such policies or procedures impact the Services, (ii) inaccurate Client data, (iii) Client's failure to perform its obligations under the Agreement, including, but not limited to, its failure to meet agreed upon processing or funding deadlines, and/or (iv) force majeure events (as defined in Section 15.7 of the Agreement).

E-FILED 11/07/2023 9:40 AM / CONFIRMATION 1391480 / A 2304792 / COMMON PLEAS DIVISION / IFIJ



A more human resource.

5. **Service Level Failure**.

5.1 **Service Level Credits**. Subject to Section 4 (Excused Performance), in the event of a Service Level Failure, Client will be entitled to a credit. The amount of such credit will be calculated quarterly, starting on the Service Level Commencement Date, in accordance with Sections 5.2 – 5.4 (each such credit, a "Service Level Credit").

5.2 **Calculation.** Each Service Level Credit will be computed as follows:

| Service Level Credit = A x B | Where |
| --- | --- |
| | A = the Allocation Percentage for the applicable Service Level Credit |
| | B = the applicable At-Risk Amount |

5.3 **Sample Calculation**. Assume that: (i) ADP has failed to meet the Service Level for ADP Application Program Availability during a given calendar month, (ii) the Allocation Percentage for the ADP Application Program Availability Service Level is thirty percent (30%), (iii) the fee for the applicable Service is $500,000 for such month, and (iv) the At-Risk Amount is five percent (5%). The applicable Service Level Credit would be computed as follows:

| Service Level Credit = A x B | Where |
| --- | --- |
| | A = the Allocation Percentage |
| | = 30% (or 0.3) |
| | B = the At-Risk Amount |
| | = (5% × $500,000) = $25,000 |
| | = 0.3 × $25,000 |
| Service Level Credit | $7,500 |

5.4 **Multiple Service Level Failures**. If a single incident results in multiple Service Level Failures, Client will be entitled to receive only the highest Service Level Credit (i.e., only one credit) resulting from such incident.

5.5 **Maximum Credit**. Notwithstanding anything in this Exhibit 3 to the contrary, the maximum amount of Service Level Credits during a single calendar month will be limited, in the aggregate, to the At Risk Amount.

PROPRIETARY AND CONFIDENTIAL TO ADP, LLC

E-FILED 11/07/2023 9:40 AM / CONFIRMATION 1391480 / A 2304792 / COMMON PLEAS DIVISION / IFIJ



**Attachment A to Exhibit 3: Service Commitments**

**Exhibit 1      Allocation Percentage Tables**

1. **ADP HCM Services on ADP Vantage HCM**

    The following ADP HCM Services are included under ADP Vantage HCM:

| Service Level | Allocation Percentage |
|---|---|
| ADP Application Program Availability* | 100 |
| At Risk Amount | 5% |

\* Applicable to the following ADP Application Programs: ADP Vantage HCM.



PROPRIETARY AND CONFIDENTIAL TO ADP, LLC

SECOND AMENDMENT

TO

MASTER SERVICES AGREEMENT

BETWEEN

**ADP, LLC**

AND

**BELCAN LLC**

This Second Amendment (the "Second Amendment"), made as of December 6, 2018 ("Second Amendment Effective Date") between ADP, LLC ("ADP") and Belcan LLC ("Client") contains changes, modifications, revisions and additions to the terms and conditions of the Master Services Agreement dated December 31, 2013, as amended (the "Agreement"), between Client and ADP.

Now, therefore, in consideration of the mutual covenants contained in the Agreement and herein, and for other good and valuable consideration, ADP and Client hereby agree as follows:

**1.    Tax Credit Services.** As of the Second Amendment Effective Date, and in addition to the Services provided by ADP under the Agreement, ADP is authorized to provide to Client and Client is authorized to receive from ADP the Tax Credit Services in accordance with Pricing Appendix-2 and Annex U, each attached hereto and made a part hereof, and the terms of the Agreement. For purposes of the Tax Credit Services provided under this Second Amendment, any reference to the Pricing Appendix in the Agreement will be deemed to refer to Pricing Appendix-2.

**2.    General Provisions; Effect of Second Amendment.** All other terms and conditions of the Agreement shall remain in full force and effect. In the event of any conflict between the terms and conditions of this Second Amendment and the terms and conditions of the Agreement, this Second Amendment shall prevail. The terms defined in the Agreement and used in this Second Amendment shall have the same respective meanings as set forth in the Agreement, unless clearly otherwise defined in this Second Amendment. This Second Amendment may be executed in multiple original copies, identically worded, and each such executed copy constitutes an original. Facsimile signatures, electronic signatures in connection with the electronic signature delivery system utilized by ADP and signatures transferred in .pdf or a similar format for scanned copies of documents are original signatures for all purposes of this Second Amendment and the Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Second Amendment to be duly executed by its authorized representatives as of the date below, to be effective as of the Second Amendment Effective Date.

**ADP, LLC**

By: _Julie Farraj_

Name: Julie Farraj

Title: DVP/GM

Date: 12/6/18

**BELCAN LLC**

By: _(signature)_

Name: Tony Williams

Title: CTO

Date: 12/4/2018

*(stamp: APPROVED AS TO FORM — ADP LEGAL)*

**ANNEX U**
**ADP Tax Credit Services**

Client desires to receive and ADP agrees to provide the following Services to Client in addition to those already provided under the Agreement.

1. **Definitions.** Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed that term in the Agreement.

   1.1. **"E-Signature Feature"** has the meaning set forth in Section 3.2.3.

   1.2. **"Incentive"** means tax, financial or operational benefits, including tax credits, pursued through the Services provided, in whole or part, by ADP.

   1.3. **"Incentive Accrual Period"** means each year that Client receives/realizes the Incentive(s) that ADP initiated on Client's behalf regardless of the termination of the ADP Tax Credit Services.

   1.4. **"WOTC Claims"** has the meaning as set forth in Section 3.2.4.

2. **Service Summary.**

   2.1. **ADP Tax Credit Services.** Services to help employers with financial incentive programs created by federal, state, and local governments, including Work Opportunity Tax Credit (WOTC), geographic credits, demographic credits, training credits, economic development incentives and property tax abatements.

3. **Additional Terms.** The following additional terms and conditions apply to the ADP Tax Credit Services:

   3.1. **ADP Obligations.**

      3.1.1. ADP will, with Client's reasonable assistance, prepare all necessary paperwork, complete all procedural tasks, and communicate on Client's behalf with appropriate officials concerning the Incentives.

      3.1.2. ADP will provide Client with appropriate reports which summarize the results of the Incentive-related activities and savings realized.

   3.2. **Additional Terms for Work Opportunity Tax Credit ("WOTC").**

      3.2.1. **Additional ADP Obligations.**

         3.2.1.1. Coordinate the collection and filing of documentation necessary for the WOTC certification process.

         3.2.1.2. Calculate Incentives based upon reported eligible wages of qualified employees.

      3.2.2. **Client Obligations.**

         3.2.2.1. Completion of the WOTC screening by job applicants is voluntary. With respect to participating applicants who complete the screening, the applicable WOTC statute provides that such applicants must be screened for eligibility on or before the day the individual is offered employment with the employer. Client is solely responsible for causing its participating applicants to screen for WOTC eligibility in a timely manner via Client's chosen screening method.

**3.2.2.2.** Client acknowledges that it will be required to make certain elections and decisions and instruct ADP regarding its WOTC program and process setup during the implementation of the Services and/or on an ongoing basis, and such elections, decisions and directives to ADP may impact Client's compliance with applicable laws or WOTC program requirements. Client is solely responsible for making such elections and decisions and providing such directives to ADP, and Client will be solely responsible for the consequences of the same.

**3.2.2.3.** If Client elects an electronic screening method, Client will provide job applicants with secure access to the ADP Application Program to screen applicants for WOTC eligibility.

**3.2.2.4.** Client will assist job applicants/employees, as applicable, in completing forms and submitting documentation to ADP.

**3.2.3.** **Electronic Signature Feature.** ADP may, in its discretion as a prerequisite to Client's receipt and continued use of the WOTC services, offer Client and/or its job applicants the ability to digitally or electronically sign ("**E-Signature Feature**") documents relating to WOTC. Client will cooperate with ADP as reasonably requested to implement and utilize the E-Signature Feature (including, providing one or more duly authorized Client signatures for use). ADP may, at any time upon notice to Client, terminate, suspend or limit the E-Signature Feature.

**3.2.4.** **WOTC Indemnity.** Client will indemnify, defend and hold ADP and its affiliates, and their respective officers, directors, members, managers, shareholders, employees, agents and representatives, harmless from and against any and all suits, actions, causes of action, claims, damages, liabilities, obligations, losses, penalties, costs and expenses of any nature whatsoever (including, without limitation, settlement amounts and reasonable attorneys' fees and expenses) (collectively, "**WOTC Claims**") arising from or in connection with: (a) any allegation that Client's screening or other WOTC processes violate any applicable law, regulation or WOTC program requirement (including, without limitation, the requirement to screen job applicants for WOTC eligibility on or before the day the applicant is offered employment with Client); and/or (b) any action ADP performs or undertakes in connection with the WOTC services pursuant to any instruction, directive, request, election or representation of Client. The foregoing indemnity will not apply, and Client will not be liable for any WOTC Claims, to the extent such WOTC Claims arise from the gross negligence or willful or criminal misconduct of ADP; provided, however, that notwithstanding the foregoing or anything to the contrary contained herein, ADP will be under no duty to review any Client instruction, directive, request, election or representation relating to or affecting the WOTC services. Notwithstanding anything to the contrary contained herein or in the Agreement (including, without limitation, Section 7.3 of Annex A and Section 3.2.5 of this Annex U), Client's obligations pursuant to this paragraph will not be subject to, and will specifically be excluded from, any limitations on Client's liability for direct damages otherwise agreed upon by the parties.

**3.2.5.** **Limitation of Liability.** For purposes of the ADP Tax Credit Services, "twelve (12) times the average monthly fee for ongoing Services paid by Client to ADP for the affected Services during such calendar year" as set forth in subsection (i) of Section 7.3 of Annex A shall be replaced by "the total fees received by ADP from Client for the ADP Tax Credit Services during such calendar year" and "twenty four (24) times the average monthly fee for ongoing Services paid by Client to ADP for the affected Services during such calendar year" as set forth in subsections (ii) of Section 7.3 of Annex A shall be replaced by "two times the total fees received by ADP from Client for the ADP Tax Credit Services during such calendar year".

3.3. **Disclaimer.**  ADP does not guarantee that any Incentives will be obtained by Client as a result of the Services.  Further, ADP is not a tax preparer and is not responsible for Client's federal, state or local tax returns.

3.4. **ADP Tax Credit Services Specific Financial Terms.**

3.4.1. **Incentives and Credits.**  In determining fees due, any Incentives (generated by ADP) available to be claimed will be deemed to be utilized prior to any other credits that are available to Client.  Further, carry-forward credits secured through ADP's services will be deemed to be used, from the earliest year of generation forward, prior to other available credits.

In the event an Incentive results in a refund, ADP's fees shall include the applicable percentage of said refund and interest received, which shall be payable by Client thirty (30) days after receipt of invoice.

3.4.2 **Post-Termination Services and Fees.**  Client acknowledges that it may realize benefits of certain Incentives subsequent to the termination of the Services.  ADP's fees relating thereto shall continue to accrue, and Client's obligation to pay such fees shall continue during the Incentive Accrual Period.  Example:  Services provided by ADP allow Client to receive benefits in future years.  In such event, ADP's fees shall accrue for all years for which Client is eligible to receive benefits regardless of (a) the termination of the Services, or (b) Client's ability to utilize the Incentives.  To the extent applicable and necessary, ADP shall continue providing the Services on a post-termination basis, and Client shall continue to provide such reasonable assistance as may be necessary for ADP to do so (including, without limitation, permitting and facilitating ongoing ADP access to relevant data and documentation).

3.4.3 **Refund/Credit of Fees.**  ADP will refund or credit to Client any fees paid related to Incentives subsequently revoked or denied by any Federal, State or Local governmental authority, upon audit or otherwise, to the extent such revocation or denial is attributable to identifiable errors by ADP in its performance of the Services, and ADP has been provided the opportunity to assist Client in seeking the reversal of the revocation or denial.  Such fees will be repaid to Client within thirty (30) days after final adjudication of the revocation or denial or credited against fees to become due under this Agreement within the one hundred twenty (120) day period following such final adjudication, as Client shall elect.  To the extent applicable, a refund of fees is not required if Client chooses to dispose of assets that subsequently triggers Incentive recapture.



Pricing Appendix-2

Service and Fee Schedule
Belcan LLC

**SECTION 1**          **THE CLIENT GROUP.**
                       Belcan LLC

**SECTION 2**          **ADDRESS OF ADP FOR NOTICES.**
                       ADP, LLC
                       400 W. Covina Blvd., MS 208
                       San Dimas, CA 91773

**SECTION 3**          **TERMINATION DATE.**
                       The termination date is that date which is the 3 year anniversary of the Second Amendment
                       Effective Date.

**SECTION 4**          **FEE EFFECTIVENESS; FEE CHANGES.**
                       The fees set forth on the Pricing Appendix-2 will remain fixed for 1 year following the Second
                       Amendment Effective Date.   Thereafter, ADP may modify the fees for the Services and will
                       give Client at least 30 days prior written notice of any changes in such fees.

                       Client shall pay directly, or shall reimburse to ADP, any fees (including, without limitation,
                       application fees or voucher fees) or other costs required by any governmental or other
                       agencies in connection with applying for or obtaining tax incentives and benefits pursuant to
                       the ADP Tax Credit Services.

**SECTION 5**          **FINANCIAL DETAILS**

| Work Opportunity Tax Credit (WOTC) Program | Screening Method | Contingency Fee |
|---|---|---|
| Work Opportunity Tax Credit (WOTC) | Web In | 11.00% of gross tax credit amounts documented by ADP for Client. |

**Strictly for ADP's planning purposes, Client's target go-live date with WOTC will be 1/7/2019. Further, Client
projects to hire approximately 6250 employees in the next 12 months.**

**SECTION 6**          **EXPENSES.**
                       In addition to the fees listed in this Pricing Appendix-2, postage, delivery charges, other
                       similar third party charges, and reasonable travel and out-of-pocket expenses are payable by
                       Client.

ADP Proprietary and Confidential

THIRD AMENDMENT

TO

MASTER SERVICES AGREEMENT

BETWEEN

**ADP, LLC**

AND

**BELCAN, LLC**

This Third Amendment (the "Third Amendment"), made as of _June 11_, 20_20_("Third Amendment Effective Date") between ADP, LLC ("ADP") and Belcan, LLC ("Client") contains changes, modifications, revisions and additions to the terms and conditions of the Master Services Agreement dated December 31, 2013, as amended (the "Agreement"), between Client and ADP.

Now, therefore, in consideration of the mutual covenants contained in the Agreement and herein, and for other good and valuable consideration, ADP and Client hereby agree as follows:

1.  **Employment Verification and Wage Garnishment Services**. As of the Third Amendment Effective Date, and in addition to the Services provided by ADP under the Agreement, ADP will provide to Client and Client will receive from ADP the Employment Verification Services and the Wage Garnishment Services in accordance with Pricing Appendix-3 and on the terms and conditions set forth in Annexes GG and W attached hereto and made a part hereof. All references to "Pricing Appendix" shall be deemed to refer to the "Pricing Appendix-3" for purposes of such added Services.

This Third Amendment may be executed in multiple original copies, identically worded, and each such executed copy constitutes an original. Facsimile signatures, electronic signatures in connection with the electronic signature delivery system utilized by ADP and signatures transferred in .pdf or a similar format for scanned copies of documents are original signatures for all purposes of this Third Amendment and the Agreement.

All other terms and conditions of the Agreement shall remain in full force and effect. In the event of any conflict between the terms and conditions of this Third Amendment and the terms and conditions of the Agreement, this Third Amendment shall prevail. The terms defined in the Agreement and used in this Third Amendment shall have the same respective meanings as set forth in the Agreement, unless clearly otherwise defined in this Third Amendment.

**IN WITNESS WHEREOF**, the parties hereto have caused this Third Amendment to be duly executed by its authorized representatives as of the date first above written.

Signature Page Follows

**ADP, LLC**

**BELCAN, LLC**

By: _____

By: _____

Name: _____

Name: _Michael J. Wirth_____

Title: _____

Title: _Chief Accounting Officer_

Date: _____

Date: _June 11, 2020_____

**ANNEX GG**
**Employment Verification Services**

Client desires to receive and ADP agrees to provide the following Services to Client in addition to those already provided under the Agreement.

1. **Definitions.** Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed that term in the Agreement.

    1.1. **"FCRA"** means the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq.

    1.2. **"Verification Agent"** has the meaning set forth in Section 3.1.1.

    1.3. **"Verification Data"** has the meaning set forth in Section 3.1.1.

    1.4. **"Verifiers"** has the meaning set forth in Section 3.1.1.

2. **Service Summary.**

    2.1. **Employment Verification Services.**  Management of employment and income verification requests.

3. **Additional Terms.** The following additional terms and conditions apply to the Employment Verification Services:

    3.1. **Employment Verification Services.**  Client authorizes ADP and its subcontractors through which Employment Verification Services are performed ("**Verification Agents**") to disclose, on Client's behalf, employment information and income ("**Verification Data**"), to commercial, private, non-profit and governmental entities and their agents (collectively, "**Verifiers**"), who wish to obtain or verify any of Client's employees' (or former employees') Verification Data. Verification Data will be disclosed to Verifiers who certify they are entitled to receive such data (as described below) pursuant to FCRA, and, in the case of income information requests, who additionally certify they have a record of the employee's consent to such disclosure or who utilize a salary key. In accordance with FCRA, Verification Data may be provided to Verifiers where (i) the employee has applied for a benefit (such as credit, other employment or social services assistance); (ii) the employee has obtained a benefit and the Verifier is seeking to (a) determine whether the employee is qualified to continue to receive the benefit; and/or (b) collect a debt or enforce other obligations undertaken by the employee in connection with the benefit; or (iii) the Verifier is otherwise entitled under FCRA to obtain the Verification Data. In certifying they have a record of the employee's consent, Verifiers generally rely on the employee's signature on the original application as authorization for the Verifier to access the employee's income data at the time of the application and throughout the life of the obligation. Client understands that Verifiers are charged for commercial verifications processed through ADP or its Verification Agents.

    3.2. **Data Quality.**  If requested by ADP, Client agrees to work with ADP during implementation to produce a test file and validate the Verification Data included in the Verification Services database using validation reports made available by ADP or its Verification Agents. If Client uses ADP's hosted payroll processing services, ADP will update the Verification Services database with the applicable Verification Data available on ADP's payroll processing system.

    3.3. **Notice to Furnishers of Information: Obligations of Furnishers of Information** ("Notice to Furnishers"). Client certifies that it has read the Notice to Furnishers provided to Client at the following URL: https://www.consumer.ftc.gov/articles/pdf-0092-notice-to-furnishers.pdf. Client understands its obligations as a data furnisher set forth in such notice and under FCRA which include duties regarding data accuracy and investigation of disputes, and certifies it will

comply with all such obligations. Client further understands that if it does not comply with such obligations, ADP may correct incorrect Verification Data on behalf of Client or terminate the Employment Verification Services upon 90 days prior written notice to Client.

3.4. **Archival Copies.** Notwithstanding anything to the contrary in Annex A, Client agrees that, after the termination of this Agreement, ADP and its Verification Agents may maintain archival copies of the Verification Data as needed to show the discharge and fulfillment of obligations to Client's employees and former employees and the provisions of Section 6.3 of Annex A will continue to apply during the time that ADP and its Verification Agents maintain any such archival copies.

3.5. **Additional Termination Provisions for Employment Verification Services.** ADP may, in its sole discretion, terminate the Employment Verification Services at any time upon 90 days prior written notice to Client should a Verification Agent notify ADP that it is no longer willing to provide the Employment Verification Services and ADP, after taking commercially reasonable steps, cannot engage a successor Verification Agent.

**ANNEX W**

**ADP Wage Garnishment Services**

Client desires to receive and ADP agrees to provide the following Services to Client in addition to those already provided under the Agreement.

1. **Definitions.** Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed that term in the Agreement.

   1.1. **"Agencies"** has the meaning set forth in Section 4.1.2.

   1.2. **"Court Filed Notification"** has the meaning set forth in Section 4.2.

   1.3. **"e-IWO Program"** has the meaning set forth in Section 4.4.

   1.4. **"Flash Signatures"** has the meaning set forth in Section 4.3.

   1.5. **"NACHA"** means the National Automated Clearing House Association.

   1.6. **"Payee"** means any intended recipient of payments under the Payment Services and may include Client's employees, taxing authorities, governmental agencies, suppliers, benefit carriers and/or other third parties; provided that in the case of Wage Payment Services, Payee shall be limited to Client's employees and independent contractors.

   1.7. **"Payment Services"** means Services that involve electronic or check payments being made by ADP to third parties on Client's behalf and at its direction.

2. **Service Summary.**

   2.1. **ADP Wage Garnishment Services.** Administration of child support orders, creditor garnishments, tax levies, bankruptcies, and student loan liens; which includes garnishment data and order processing, response and notification processing, payment processing and disbursement of payments to the appropriate payees, and inquiry management for employees, custodial parents, agencies and other third parties.

3. **Additional Terms.** The following additional terms and conditions apply to the ADP Wage Garnishment Services:

   3.1. **Description of Services; Authorization.**

      3.1.1. ADP will act solely as a third party service provider of garnishment data evaluation, data processing and payment processing. ADP may from time to time provide Client reasonable instructions or best practice recommendations which Client may follow. However, the ADP Wage Garnishment Services are not a substitute for the advice of an attorney. Client agrees that ADP is not a law firm, does not provide legal advice or representation and that no attorney-client relationship exists or will be formed between ADP and Client.

      3.1.2. Client authorizes ADP to (i) use Client's data to populate document templates and create garnishment responses and other standard form documents, (ii) file electronic documents on Client's behalf and at its direction where permitted by the relevant court or agency, and (iii) prepare and serve written notices to third parties on Client's behalf and at its direction. ADP will perform the ADP Wage Garnishment Services in accordance with and subject to the documents and information provided to ADP by Client or agencies (including federal and state tax, credit and child support agencies, courts, levying officers and bankruptcy trustees (collectively, **"Agencies"**), or by any other third parties from whom Client has directed or authorized ADP and ADP has agreed to accept

such documents and information. In the event ADP has any questions relating to the application of same to a particular set of facts or if an employee of Client notifies ADP of his or her objection to ADP's evaluation or application of the same, then ADP will notify Client of such questions or objections. Client will be responsible for obtaining answers to any such questions or resolving such objections.

**3.1.3.** Client will be solely responsible for cases or claims by third parties against ADP unless the case or claim directly results from an ADP error or omission.

**3.2.** **Court Filed Notifications.** To the extent Client elects ADP to perform court filed notification services (e.g., creditor garnishments), Client will review a copy of each ADP standard form notification that ADP will use to produce, submit and/or file such garnishment notice with a court of law (each, a "**Court Filed Notification**") as part of the ADP Wage Garnishment Services and hereby directs ADP to utilize such Court Filed Notifications on Client's behalf. ADP will be responsible for (i) monitoring changes in applicable rules that impact the format of each Court Filed Notification, (ii) implementing changes to the Court Filed Notification forms as deemed necessary, in ADP's reasonable discretion, to address such changes in applicable rules, and (iii) notifying Client of any such changes by providing Client with a copy of any modified Court Filed Notification form. Notwithstanding the foregoing, Client will be responsible for making its own determination as to the legal sufficiency of each standard form, as modified by ADP from time to time, and their continued use by ADP on Client's behalf in each jurisdiction. Client will be responsible for providing a consenting party (including any required notarization) to execute each Court Filed Notification created by ADP on Client's behalf. Except for ADP's obligations stated in this Section, ADP will not be liable hereunder to Client or any third party for the legal sufficiency of the format of any Court Filed Notification utilized by Client hereunder.

**3.3.** **Flash Signature Feature.** ADP may, in its discretion and in accordance with its client reference guides and set-up and approval process, offer Client digitized client signature and notary stamp and notary signature functionality ("**Flash Signatures**") as an optional feature of the Wage Garnishment Services. Notwithstanding anything to the contrary in Section **Error! Reference source not found.**, ADP will not be responsible for the design or compliance of Flash Signatures and makes no representations, warranties or determinations regarding the compliance of the use of Flash Signatures on Court Filed Notifications. To the extent Client elects to use Flash Signatures on its Court Filed Notifications, Client is responsible for ensuring that such signatures are, in Client's view, consistent with Client's compliance requirements.

**3.4.** **Accuracy and Timeliness of Data.** Client is responsible for (i) the way in which Client's payroll system utilizes data passed by ADP to Client in connection with ADP's provision of the ADP Wage Garnishment Services and (ii) any errors or omissions caused by any of Client's third-party service providers.

**3.5.** **Electronic Income Withholding Orders Program.** To the extent Client chooses to participate in the Electronic Income Withholding Orders Program (the "**e-IWO Program**"), Client authorizes ADP as its third party service provider to receive, reply upon, and process electronic income-withholding orders/notices from the Office of Child Support Enforcement that have been issued by jurisdictions participating in the e-IWO Program. Client understands that there is a 30-day startup period for orders to convert from hard-copy documents mailed to Client to the electronic method. For the jurisdictions participating in the e-IWO program, Client will continue to forward to ADP all income-withholding orders/notices or related documentation it receives. Client agrees to provide written notice to ADP at least 45 days in advance if it wishes to no longer participate in the e-IWO Program. Client also agrees that ADP may, at its sole discretion, discontinue participation in the e-IWO Program at any time.

**3.6.** **Additional Suspension Provisions for ADP Wage Garnishment Services.** If ADP reasonably determines that it can no longer provide any or all of the ADP Wage Garnishment Services due to changes in applicable law or application of existing law, ADP may, upon notice to Client suspend the applicable portion of the ADP Wage Garnishment Services that it is no longer able

to perform. Upon suspension, Client will (i) be responsible for payment of Client's wage garnishment and voluntary deduction amounts associated with that portion of the ADP Wage Garnishment Services suspended by ADP and not otherwise collected from Client by ADP including, without limitation, any judgments, court costs, legal fees, and interest accruing after the date of such termination and (ii) be responsible for its garnishment answer and filing obligations. In the event such suspension exceeds 30 days, such suspension shall become a termination.

3.7. **Payment Services.** The following additional terms and conditions apply to the ADP Wage Garnishment Services.

3.7.1. **Suspension**. Without limiting the foregoing, the parties agree that Payment Services involve credit risk to ADP. Payment Services may be suspended by ADP (**A**) immediately following notice to Client (i) that Client has failed to remit sufficient, good and available funds within the deadline and via the method of delivery set forth in Pricing Appendix-2 as it relates to the applicable Payment Services, or (ii) if Client breaches any rules promulgated by the National Automated Clearing House Association as it relates to ADP conducting ACH transactions on behalf of Client, and (**B**) with 24 hour notice if: (i) a bank notifies ADP that it is no longer willing to originate debits from Client's account(s) or credits for Client's behalf for any reason or (ii) the authorization to debit Client's account is terminated or ADP reasonably believes that there is or has been fraudulent activity on the account. If the Payment Services are terminated or suspended pursuant to Section 8.4 of Annex A or this Section, Client acknowledges that ADP shall be entitled to allocate any funds in ADP's possession that have been previously remitted or otherwise made available by Client to ADP relative to the Payment Services in such priorities as ADP may determine appropriate, including reimbursing ADP for payments made by ADP on Client's behalf to a third party. If the Payment Services are terminated by ADP, Client understands that it will (x) immediately become solely responsible for all of Client's third party payment obligations covered by the Payment Services then or thereafter due, and (y) reimburse ADP for all payments properly made by ADP on behalf of Client to any payee, which has not been paid or reimbursed by Client. If the Payment Services remains suspended for 30 days, the affected Payment Service shall be deemed terminated on the 31st day following suspension.

3.7.2. **Client Credentialing.** Client understands and acknowledges that the implementation and ongoing provision of Payment Services are conditioned upon Client passing (and continuing to pass) a credentialing process that ADP may deem necessary in connection with the provision of Payment Services.

3.7.3. **Additional Requirements**. Payment Services may be subject to the rules and standards of any applicable clearing house, payment and/or card networks or associations. Client and ADP each agree to comply with all such rules and standards applicable to it with respect to the Payment Services.

3.7.4. **Funding Obligations**. Client acknowledges that ADP is not a lender. As such, as a condition to receiving services, Client will remit or otherwise make available to ADP sufficient, good and available funds within the agreed-to deadline and via the agreed-to method of delivery to satisfy all of Client's third-party payment obligations covered by the Agreement. ADP will apply such funds to satisfy such third-party payment obligations. ADP will not be required to provide Payment Services if ADP has not received all funds required to satisfy Client's third-party payment obligations. Client will immediately notify ADP if it knows or should know that it will not have sufficient funds to satisfy the amounts required in connection with the Payment Services. If Client has a material adverse change in its condition, ADP may modify the funding method or deadline by which funds must be made available to ADP for payment to Payees. Client agrees to pay to ADP upon demand any amounts that have been paid by ADP to satisfy Client's third party payment obligations prior to receiving such amounts from Client.

**3.7.5.** **Investment Proceeds; Commingling of Client Funds**. IF ADP RECEIVES CLIENT'S FUNDS IN ADVANCE OF THE TIME ADP IS REQUIRED TO PAY SUCH FUNDS TO THIRD PARTIES, ALL AMOUNTS EARNED ON SUCH FUNDS, IF ANY, WHILE HELD BY ADP WILL BE FOR THE SOLE ACCOUNT OF ADP.  ADP may commingle Client's funds with similar funds from other clients and with similar ADP and ADP-administered funds.  ADP utilizes a funds control system that maintains general ledger entries by client and/or by jurisdiction.

**3.7.6.** **Recovery of Funds; Stop Payment Requests.** Client agrees to cooperate with ADP and any other third parties to recover funds erroneously issued or transferred to any Payee or credited to any Payee's account. If Client desires to stop payment on any check or to recall or reverse any electronic payment, Client will provide ADP with a stop payment request in the form required by ADP.  Client acknowledges that ADP's placement of a stop order request is not a guarantee that such stop payment will occur.

**PRICING APPENDIX-3**
**SERVICE AND FEE SCHEDULE**

SECTION 1      **THE CLIENT GROUP.**
Belcan, LLC

SECTION 2      **ADDRESS OF ADP FOR NOTICES.**
ADP, LLC
400 W. Covina Blvd., MS 208
San Dimas, CA 91773

SECTION 3      **TERMINATION DATE.**
The termination date is that date which is the 3 year anniversary of the Third Amendment Effective Date.

SECTION 4      **FEE EFFECTIVENESS; FEE CHANGES.**
The fees set forth on the Pricing Appendix-3 will remain fixed for 1 year following the Third Amendment Effective Date. Thereafter, ADP may modify the fees for the Services and will give Client at least 30 days prior written notice of any changes in such fees.

SECTION 5      **FINANCIAL DETAILS**

| One-time Implementation Fees | One-time Cost |
|---|---|
| INCLUDES: | |
| ADP Employment Verification Services | $750.00 |
| ADP Wage Garnishment Services | $1875.00 |
| **Sub-total One-Time Implementation Fees** | **$2625.00** |
| **Total Estimated One-Time Implementation Fees** | **$2625.00** |

- Pricing does not include travel and related expenses, any such expenses will be billed as incurred.

| Ongoing Services Fees | Per Employee Per Month (PEPM) | Estimated Annual Cost |
|---|---|---|
| INCLUDES: | $0.67 | $5,952.00 |
| Wage Garnishment Services | - | |
| **Sub-total Estimated Ongoing Services Fees** | **$0.67** | **$5,952.00** |
| **Total Estimated Ongoing Services Fees** | | **$5,952.00** |

- Pricing assumes 736 paid employees and 0 unpaid employees. Actual invoicing will be based on employees in a non-terminated status.

**PRICING APPENDIX-3**
**SERVICE AND FEE SCHEDULE**

**Processing Assumptions for Wage Garnishment Services**

The fees presented were calculated based upon the assumptions set forth below and if Client's actual requirements vary from what is stated, the parties shall negotiate in good faith to adjust the fees based on such changes. The fees do not include any customizations to any Service.

| Category | Item Description | Units Included in Fees | Rate per Unit (or ADP Prevailing Rate) | Based on |
|---|---|---|---|---|
| ADP Wage Garnishment Services | | | | |
| Populations | Garnishment Payments Annually | 240 | Included | |
| | New Lien Processing | 240 | Included | |
| | Pre-qualification Queue Notification Letters | 48 | Included | |

**Funding Requirements and Disbursement Disclosure:**

> For ADP Wage Garnishment Services and Fees

> **Funding**
> Client will transmit wage garnishment information, deductions and liabilities to ADP one business day prior to the associated payroll check date via reverse wire.
> • For reverse wire clients, funds must be available by 6:00 a.m. Pacific time.

| ADP Employment Verification Services | Quantity Assumed | Rate | Base |
|---|---|---|---|
| Commercial Employment & Income Verification | 736 | $0.00 | $0.00 |
| Social Services Verification | 736 | $0.00 | $0.00 |

**Additional Services**

The fees for Additional Services are set forth in the table below. These fees are based on the scope of work outlined and will be charged at the applicable rates as they occur after the Services commence.

**ADP Employment Verification Services**

**Processing** (Fees billed monthly in advance)

| | |
|---|---|
| Client Access Calls to Place and/or Remove Employee Information Holds | Included |
| Periodic File Updates | Included |
| Electronic Management Reports | Included |
| Employee File Transmissions | Included |

Proprietary and Confidential to ADP, LLC

**PRICING APPENDIX-3**
**SERVICE AND FEE SCHEDULE**

| | |
|---|---|
| Electronic Files | Included |
| Standard PIN Administration | Included |
| Wage Type Details | Included |

**SECTION 6**  **EXPENSES.**

In addition to the fees listed in this Pricing Appendix-3, postage, delivery charges, other similar third party charges, and reasonable travel and out-of-pocket expenses are payable by Client.

Proprietary and Confidential to ADP, LLC
Belcan, LLC



FOURTH AMENDMENT

TO

MASTER SERVICES AGREEMENT

BETWEEN

**ADP, INC.**

AND

**BELCAN, LLC**

This Fourth Amendment (the **"Fourth Amendment"**), made as of   November 18, 2022   (**"Fourth Amendment Effective Date"**) between ADP, Inc. ("**ADP"**, formerly known as ADP, LLC) and Belcan, LLC ("**Client**") contains changes, modifications, revisions and additions to the terms and conditions of the Master Services Agreement dated December 31, 2013, as amended (the "Agreement"), between ADP and Client.

Now, therefore, in consideration of the mutual covenants contained in the Agreement and herein, and for other good and valuable consideration, ADP and Client hereby agree as follows:

**1.     Additional ADP Tax Credit Services.** As of the Fourth Amendment Effective Date, and in addition to the other Services provided by ADP under the Agreement, ADP will provide to Client, and Client will receive from ADP, the ADP Tax Credit Services (the **"Additional Services"**) in accordance with Annex U and Pricing Appendix-4, each attached hereto and incorporated herein, and the Agreement. For the purposes of the Additional Services provided under this Fourth Amendment, all references in the Agreement to the "Pricing Appendix" shall be deemed to refer to the Pricing Appendix-4 attached hereto. Additionally, as of the Fourth Amendment Effective Date, Client and ADP agree that this Fourth Amendment shall supersede and replace in its entirety that certain Second Amendment to this Agreement, dated December 6, 2018, including Annex U and the Pricing Appendix thereto.

**2.     Cover Page, List of Services.** As of the Fourth Amendment Effective Date, the list of Services on the cover page of the Agreement is hereby amended by adding the following to the end of such list:

  _X_  Annex U     ADP Tax Credit Services

**4.     General Provisions; Effect of Fourth Amendment.** All other terms and conditions of the Agreement shall remain in full force and effect. In the event of any conflict between the terms and conditions of this Fourth Amendment and the terms and conditions of the Agreement, this Fourth Amendment shall prevail. The terms defined in the Agreement and used in this Fourth Amendment shall have the same respective meanings as set forth in the Agreement, unless clearly otherwise defined in this Fourth Amendment. This Fourth Amendment may be executed in multiple original copies, identically worded, and each such executed copy constitutes an original. Facsimile signatures, electronic signatures in connection with the electronic signature delivery system utilized by ADP and signatures transferred in .pdf or a similar format for scanned copies of documents are original signatures for all purposes of this Fourth Amendment and the Agreement.

**[Signature page follows.]**



**IN WITNESS WHEREOF**, the parties hereto have caused this Fourth Amendment to be duly executed by its authorized representatives as of the date below, to be effective as of the Fourth Amendment Effective Date.

**ADP, INC.**

By: _____

Name: Rob Hamilton

Title: SVP/GM

Date: 11/18/22

**Belcan LLC**

By: _____

Name: Michael J. Wirth

Title: Chief Accounting Officer

Date: November 16, 2022



**ANNEX U**

**ADP Tax Credit Services**

Client desires to receive and ADP agrees to provide the following Services to Client in addition to those already provided under the Agreement.

**1.    Definitions.** Unless a capitalized term used herein is defined herein, it shall have the same meaning ascribed that term in the Agreement.

**1.1.**    "**E-Signature Feature**" has the meaning set forth in Section 4.2.3.

**1.2.**    "**Incentive**" means tax, financial or operational benefits, including tax credits, pursued through the Services provided, in whole or part, by ADP.

**1.3.**    "**Incentive Accrual Period**" means each year that Client receives/realizes the Incentive(s) that ADP initiated on Client's behalf regardless of the termination of the ADP Tax Credit Services.

**1.4.**    "**WOTC Claims**" has the meaning as set forth in Section 4.2.4.

**2.    Service Summary.**

**2.1.    ADP Tax Credit Services.** Services to help employers with financial incentive programs created by federal, state, and local governments, including the Work Opportunity Tax Credit (WOTC), geographic credits, demographic credits, training credits, economic development incentives and property tax abatements.

**3.    Additional Termination Provisions for ADP Tax Credit Services.** If (i) an ADP subcontractor notifies ADP that it is no longer willing or able to provide any or all of the Tax Credit Services specific to business incentives and (ii) ADP determines, in its commercially reasonable judgment, that it cannot engage a successor subcontractor, then ADP may terminate the affected Services upon at least 90 days prior written notice to Client.

**4.    Additional Terms.** The following additional terms and conditions apply to the ADP Tax Credit Services:

**4.1.    ADP Obligations.**

**4.1.1.**    ADP will, with Client's reasonable assistance, prepare all necessary paperwork, complete all procedural tasks, and communicate on Client's behalf with appropriate officials concerning the Incentives.

**4.1.2.**    ADP will provide Client with appropriate reports which summarize the results of the Incentive-related activities and savings realized.

**4.2.    Additional Terms for Work Opportunity Tax Credit ("WOTC").**

**4.2.1.    Additional ADP Obligations.**

**4.2.1.1.**    Coordinate the collection and filing of documentation necessary for the WOTC certification process.

**4.2.1.2.**    Calculate Incentives based upon reported eligible wages of qualified employees.

**4.2.2.    Client Obligations.**



**4.2.2.1.** Completion of the WOTC screening by job applicants is voluntary. If a participating applicant completes the screening, the applicable WOTC statute provides that such applicants must be screened for eligibility on or before the day the individual is offered employment with the employer. Client is responsible for causing its participating applicants to screen for WOTC eligibility in a timely manner via Client's chosen screening method.

**4.2.2.2.** Client acknowledges that it will be required to make certain elections and decisions and will instruct ADP regarding the Client's WOTC program and process setup during the implementation of the Services and/or on an ongoing basis. Such elections, decisions and directives to ADP may impact Client's compliance with applicable laws or WOTC program requirements. Client is solely responsible for (i) making such elections and decisions and providing such directives to ADP, and (ii) all consequences of its elections, decisions and directives.

**4.2.2.3.** If Client elects an electronic screening method, Client will provide job applicants with secure access to the ADP Application Program to screen applicants for WOTC eligibility.

**4.2.2.4.** Client will assist job applicants/employees, as applicable, in completing forms and submitting documentation to ADP.

**4.2.3.** **Electronic Signature Feature**. ADP may, in its discretion as a prerequisite to Client's receipt and continued use of the WOTC services, offer Client and/or its job applicants the ability to digitally or electronically sign ("**E-Signature Feature**") documents relating to WOTC. Client will cooperate with ADP as reasonably requested to implement and utilize the E-Signature Feature (including, providing one or more duly authorized Client signatures for use). ADP may, at any time upon notice to Client, terminate, suspend or limit the E-Signature Feature.

**4.2.4.** **WOTC Indemnity**. Client will indemnify, defend and hold ADP and its affiliates, and their respective officers, directors, members, managers, shareholders, employees, agents and representatives, harmless from and against any and all suits, actions, causes of action, claims, damages, liabilities, obligations, losses, penalties, costs and expenses of any nature whatsoever (including, without limitation, settlement amounts and reasonable attorneys' fees and expenses) (collectively, "**WOTC Claims**") arising from or in connection with: (a) any allegation that Client's screening or other WOTC processes violate any applicable law, regulation or WOTC program requirement (including, without limitation, the requirement to screen job applicants for WOTC eligibility on or before the day the applicant is offered employment with Client); and/or (b) any action ADP performs or undertakes in connection with the WOTC services pursuant to any instruction, directive, request, election or representation of Client. The foregoing indemnity will not apply, and Client will not be liable for any WOTC Claims, to the extent such WOTC Claims arise from the gross negligence or willful or criminal misconduct of ADP; provided, however, that notwithstanding the foregoing or anything to the contrary contained herein, ADP will be under no duty to review any Client instruction, directive, request, election or representation relating to or affecting the WOTC services. Notwithstanding anything to the contrary contained herein or in the Agreement (including, without limitation, Section 7.3 of Annex A and Section 4.2.5 of this Annex U), Client's obligations pursuant to this paragraph will not be subject to, and will specifically be excluded from, any limitations on Client's liability for direct damages otherwise agreed upon by the parties.

**4.2.5.** **Limitation of Liability**. For purposes of the ADP Tax Credit Services, "twelve (12) times the average monthly fee for ongoing Services paid by Client to ADP for the affected Services during such calendar year" as set forth in subsections (i) and (ii) of Section 7.3 of Annex A shall be replaced by "the total fees received by ADP from Client for the ADP Tax Credit Services during such calendar year" in both instances.

**4.3.** **Disclaimer**. ADP does not guarantee that any Incentives will be obtained by Client. Further, ADP is not a tax preparer and is not responsible for Client's federal, state or local tax returns. Client acknowledges that determination of Incentive eligibility and/or the ability to claim Incentives may warrant



legal or tax advice. Client is responsible for seeking advice from its own independent legal, tax and other advisors in connection with its receipt of Services.

PROPRIETARY AND CONFIDENTIAL TO ADP, INC.
*AVS MM UM Amendment Template_20180802*
*Belcan LLC*



Pricing Appendix-4

Service and Fee Schedule

Belcan LLC

| SECTION 1 | **THE CLIENT GROUP.** |
|---|---|
| | Belcan, LLC |
| SECTION 2 | **ADDRESS OF ADP FOR NOTICES.** |
| | ADP, Inc. |
| | 400 W. Covina Blvd., MS 208 |
| | San Dimas, CA 91773 |
| SECTION 3 | **TERMINATION DATE.** |

The termination date is that date which is the 3 year anniversary of the Fourth Amendment Effective Date.

| SECTION 4 | **FEE EFFECTIVENESS; FEE CHANGES.** |
|---|---|

The fees set forth on the Pricing Appendix-4 will remain fixed for 1 year following the Fourth Amendment Effective Date.  Thereafter, ADP may modify the fees for the Services and will give Client at least 30 days prior written notice of any changes in such fees.

Client shall pay directly, or shall reimburse to ADP, any fees (including, without limitation, application fees or voucher fees) or other costs required by any governmental or other agencies in connection with applying for or obtaining tax incentives and benefits pursuant to the ADP Tax Credit Services.

| SECTION 5 | **FINANCIAL DETAILS** |
|---|---|

| Work Opportunity Tax Credit (WOTC) Program | Screening Method | Contingency Fee |
|---|---|---|
| Work Opportunity Tax Credit (WOTC) | Web In | 15.00% of gross tax credit amounts documented by ADP for Client. |

**Strictly for ADP's planning purposes, Client's target go-live date with WOTC will be 10/20/2022. Further, Client projects to hire approximately 600 employees in the next 12 months.**

| SECTION 6 | **EXPENSES.** |
|---|---|

In addition to the fees listed in this Pricing Appendix, postage, delivery charges, other similar third party charges, and reasonable travel and out-of-pocket expenses are payable by Client.

ADP Proprietary and Confidential

Pricing Appendix